Campbell v. Tenn. Coal, Iron & R. Co.

DR. H. L. CAMPBELL *v.* TENNESSEE COAL, IRON & R. CO. *et al.*[*]

(*Knoxville.* September Term, 1924.)

1. **MINES AND MINERALS.** In view of stipulation, held, that complainant could not question defendant's ownership of mineral rights.

Where defendant claimed mineral rights reserved in deed from special commission to complainant's predecessors in title, *held*, in view of stipulation that parties go back to common source of title, and that technical deraignment was not required by either, complainant could not question defendant's ownership of mineral rights. (*Post, pp.* 430-432.)

2. **EJECTMENT.** In view of admissions and stipulations, held, that defendant could not question that complainant's deed covered land in issue.

In view of admissions and stipulations that parties went back to common source of title, each claiming under deed from special commissioner, *held*, that defendant could not question that complainant's deed from commissioner covered disputed strip. (*Post, pp.* 432, 433.)

3. **MINES AND MINERALS.** Fragmentary and irregular possession held not adverse.

Possession of limestone, on disputed land, which was fragmentary, irregular, and not for purpose of ripening title, *held* not to make case of adverse possession. (*Post, p.* 433.)

4. **MINES AND MINERALS.** Reservation of mineral rights held not to include limestone "mineral."

Deed to land on mountain side, largely consisting of limestone bluff, which reserved to grantor all mines and minerals contained or

*On the question as to what are "minerals" within deed, lease, or license, see note in 17 A. L. R., 156, specifically as to limestone as mineral see page 161 of above note.

imbedded in or on tract, *held*, not to reserve limestone, although "minerals," in technical sense, includes limestone. (*Post, pp.* 433-435.)

5. **DEEDS.** Reservation construed strictly against grantor.

Reservations in deed must be construed most strictly against grantor. (*Post, pp.* 435-443.)

Case cited and approved: Armstrong v. Lake Champlain Granite Co., 147 N. Y., 495.

Cases cited and distinguished: Murray v. Allred, 100 Tenn., 100; Hext v. Gill, L. R., 7, Ch. App., 699; Marvel v. Merritt, 116 U. S., 11; Brady v. Smith, 181 N. Y., 178; Countess of Listowel v. Gibbings, 9 Ir. C. L. Rep., 223; Brown v. Chadwick, 7 Ir. C. L. Rep., 101; Darvill v. Roper, 3 Drew., 294; Northern Pac. R. Co. v. Soderberg, 188 U. S., 530; State of Washington ex rel. John D. Atkinson, Attorney-General, v. Ernest E. Evans, 46 Wash., 219.

---

*Headnotes 1. Ejectment, 19 C. J., section 39;  2.  Ejectment, 19 C. J., section 39;  3. Adverse Possession, 2 C. J., section 64;  4.  Mines and Minerals, 27 Cyc, p. 685.

---

FROM COCKE.

---

Appeal from the Chancery Court of Cocke County.— Hon. Hal H. Haynes, Judge.

Turner, Kennerly & Cate and Simerly & Simerly, for complainant.

W. D. McSween and W. D. Spears, for defendants.

Mr. Justice McKinney delivered the opinion of the Court.

This is a suit in ejectment to recover a boundary of mountain land containing eight acres. It consists of a

limestone bluff, which is valuable for quarrying and manufacturing into fertilizer.

In 1870, O. C. King, as special commissioner, conveyed a two hundred twenty-six-acre tract of land to W. B. Lyle by deed containing the following provision, to-wit:

"Reserving from said sale all the mines or minerals contained or imbedded in or on said tract; also the right to enter at any time by self or agents or assignees on said land to explore for mines or mineral, with the right to make excavation, to erect works or machinery for the purpose of manufacturing such minerals as may be found on or contiguous to said land, for manufacturing, etc., and to do any and everything necessary to be done for the successful mining and manufacturing or exporting any minerals that may be discovered on or in said land, but agreeing to pay said Lyle a reasonable compensation for any actual damage that may be done to the surface of the land."

After carefully reading the record, it is evident that when this suit was instituted complainant claimed to own the eight-acre tract, in fee, through a chain of mesne conveyances from Lyle; while the defendant claimed to own, by purchase, the mineral rights reserved in the Lyle deed. Both parties understood that their title papers covered the disputed tract.

The complainant contended, in the first place, that the reservation of "mines and minerals" did not embrace limestone; and, in the second place, that, if wrong in this his predecessors in title had quarried said limestone for more than seven years, under color of title purporting to convey the fee, and had in that way perfected title to the land.

Campbell v. Tenn. Coal, Iron & R. Co.

The defendant's position was that the reservation did include limestone, and that complainant's predecessors in title had not perfected title by adverse possession.

Entertaining these views, counsel entered into the fol·lowing stipulation, to-wit:

"In this cause it is conceded and stipulated by the parties that the complainant and the Tennessee Coal, Iron & Railroad Company go back to a common source of title, each claiming under deeds from the special commissioners of the Peck estate, appointed by the chancery court of Jefferson county, Tenn.; and it is agreed that technical deraignment is not required of either party, and such title papers only as are necessary to throw light on the immediate controversy are all that are required to be filed in evidence."

The complainant has not deraigned title back to the special commissioners, and contends that it was not necessary under the above stipulation.

The defendant contends that the object of the stipulation was entered into solely for the purpose of obviating the necessity of producing title papers further back than the conveyances by the special commissioners.

The stipulation says that the parties "go back to a common source of title." In other words, that each has title back to the special commissioners. It does not say that each claims back to a common source, or that it will be unnecessary to deraign title any further back than the special commissioners, but that each goes back to a common source of title. And again:

"It is agreed that technical deraignment is not required of either party."

It is apparent that the main question in controversy was the interpretation of the reservation in the Lyle deed.

Mr. Lanier testified that he had been land agent for defendant for seventeen years, during which time he had in his charge its lands in Tennessee; also its title papers, and exhibited same, including title papers under which defendant claimed the disputed tract. He then testified as follows:

"Q. State whether or not the eight acres of land in controversy in this case are covered and embraced in the papers that you have just exhibited.

"A. Yes.

"Q. And are a portion of the W. B. Lyle tract of land?

"A. Yes, sir.

"Q. Please examine the paper here handed you, purporting to be a certified copy of a deed from W. B. Lyle and others to C. H. Witt for one hundred seventeen acres, dated 19th of March, 1878, and recorded in Book No. 1, p. 245, in the register's office of Cocke county, Tenn., and state whether or not it covers and embraces the lands in controversy in this case.

"A. I have examined the deed referred to, and it covers the land in controversy in this cause and is a deed from W. B. Lyle et al. to C. H. Witt, conveying the tract of land purchased by Lyle from O. C. King, special commissioner, on April 20, 1870, and is referred to in the first exhibit to my deposition, and is a deed from Lyle to Witt, herewith filed as Exhibit No. 4. The mineral interests in said land are reserved.

"Q. Do you know how the complainant claims this land? Does he claim through O. C. King?

"A.  Yes, sir; he claims through the same source of title.  I have listened to the depositions given today, and all of the witnesses testify to that effect."

The witness testified on cross-examination as follows:

"Q.   Do I understand you to say that Exhibit No. 4 to your deposition covers the quarries in question in this case?

"A.  Yes, sir; it covers the eight acres of land.

"Q..  You rely on the reservation of the mineral inerests contained in that deed?

"A.  Yes, sir; we claim to own the mineral.

"Q.  How do you connect with the mineral interest reserved in this deed by W. B. Lyle?

"A.  As I explained in my direct examination, it was reserved in the sale from O. C. King, special commissioner, to W. B. Lyle, and that mineral interest was conveyed to the Southern States Coal, Iron & Land Company by my Exhibit No. 2, filed to my direct examination, being the deed from J. P. Rhoton, special commissioner, to Southern States Coal, Iron & Land Company, and in exhibit No. 3 Southern States Coal, Iron & Land Company conveyed that mineral interest to the Tennessee Coal, Iron & Railroad Company."

Upon the conclusion of Lanier's testimony, said stipulation was entered into, and its meaning is obvious, when considered in the light of what Lanier conceded to be the issue in the cause.

In view of the construction which we have placed upon said stipulation, it follows that complainant cannot question defendant's ownership of said mineral rights.

An effort has been made to prove that complainant's deed does not cover the disputed strip, but we are of the

Campbell v. Tenn. Coal, Iron & R. Co.

opinion that it does and, further, that, under the admissions and stipulations referred to hereinabove, defendant cannot raise this question.

Upon the question of adverse possession, complainant has not made out his cause.

Prior to 1896, the Brookses, through whom complainant claims, probably owned this land and removed some rock therefrom. D. D. Brooks testified that they probably removed forty to forty-five cars within a period of ten or twelve years. Most of this was loose rock which they rolled down the bluff; they did little quarrying. When not working in their crops they would, at times, pile rock on the right of way for the railroad, and it would load it on flat cars and transport it to its mill, where it was crushed for ballast. The proof indicates that a large part of this rock came from the right of way of the railroad.

Where parties under color of title place a mill on a tract of land and quarry and crush rock regularly, as is now being done on this tract, and continue same for the statutory period, it will perfect their title.

But the possession here relied upon was fragmentary, irregular, and not done for the purpose of ripening title. At that time such rock was of little value, and it would hardly have occurred to an observer that a person so engaged was exercising adverse ownership over the land.

This brings us to the interesting question of the mineral reservations in the Lyle deed, and its solution necessarily depends upon the intention of the parties.

It appears from the record that in 1869 Judge Jacob Peck died the owner of many thousands of acres of undeveloped mountain lands in East Tennessee. A bill was

filed in the chancery court at Dandridge to administer
his estate, and O. C. King was appointed special com-
missioner to sell portions of said lands, and on April 20,
1870, he sold the two hundred twenty-six-acre tract for
$1.50 per acre, reserving the mineral rights, as herein-
before stated.

In 1872 said O. C. King's deposition was taken and
filed in the cause above referred to; his testimony being
as follows:

"I know much of the lands mentioned in the bill. They
lie in the mountainous parts of Cocke, Sevier, Blount,
Green, Washington, Claiborne, and Campbell counties.
They are almost wholly without value for agriculture
purposes. They were entered for their supposed deposits
of mineral ores. The minors in this cause, as well as
most of adults, are in straitened circumstances; the taxes
on the lands are burdensome, and in fact many of the
lands have been sold for taxes, and those interested in
them have not the means to redeem them. The lands are
a dead expense to the heirs, and are likely to remain so
for a long time, as they have no means to develop their
supposed mineral deposits; and in fact many of these
lands will soon be lost to the heirs entirely by reason of
the expiration of the time for redemption, unless some of
them can be soon sold for money with which to redeem the
balance. Besides, many of these lands are covered by
younger entries and grants, under which they are being
occupied, and the title to which will soon be lost to the
heirs by long-continued possession under color of title,
unless steps are taken to remove such incumbrances; and
the heirs cannot attend to such matters. I am decidedly
of opinion that it would be manifestly to the interest of

the minor heirs to have all these lands sold and the proceeds otherwise invested for the benefit of the minors, where it can be managed without too much expense, as will necessarily attend the management of these wild lands, and where their property will not be subject to so much hazard for want of attention, which the owners are wholly unable to render.''

It is unnecessary to cite authorities for the proposition that reservations in a deed must be construed most strictly against the grantor.

The two hundred twenty-six-acre tract is a mountain side, and is spoken of in the record as a bluff of limestone. It appears that, generally speaking, the surface was limestone, as well as the side of the bluff paralleling the river; the limestone was visible all over the tract, and it was not necessary to do any excavating to discover it. In fact, with the exception of a few small patches that were cleared at some indefinite period, no attempt was made to cultivate this tract of land, and the record shows that it was not susceptible of cultivation, but is valuable solely for the limestone thereon. The record discloses no evidence that it was valuable as a timber proposition. Furthermore, fifty years ago timber was of little value.

When this property was sold in 1870, limestone had no commercial value. Its use for making fertilizer and concrete had not come into vogue; there were few railroads, and only those traversing mountain sections used rock for ballast. If this reservation be construed to include limestone, it destroys the conveyance, for by quarrying the limestone the entire surface would be made way with. This being wholly a limestone proposition,

it is most reasonable to suppose that Mr. King would have reserved same by express terms, had such been his intention.

In *Murray* v. *Allred,* 100 Tenn., 100, 43 S. W., 355, 39 L. R. A., 249, 66 Am. St. Rep., 740, the court was considering whether ''oil'' was a mineral, and in the opinion quoted approvingly the following authorities:

''In 15 Am. & Eng. Enc. Law, 500, the following occurs: 'Mineral originally signified that which is obtained from a mine, from underground mining as distinguished from that which is quarried. The term is not limited to metallic substances, but includes salt, coal, paint stone and similar substances.' . . .

''In *Hext* v. *Gill,* L. R., 7, Ch. App., 699, it was said: 'Every substance which can be gotten from underneath the surface of the earth for the purpose of profit is defined as a mineral.' Again it has been held to include beds of china clay, while on the other hand freestone, quarries of limestone, and clay and sand have been decided not to be minerals.''

In *Marvel* v. *Merritt,* 116 U. S., 11, 6 S. Ct., 207, 29 L. Ed., 550, the court said:

''The word mineral is evidently derived from mine, as being that which is usually obtained from a mine, and, accordingly, Webster defines the latter as 'a pit or excavation in the earth from which metallic ores or other mineral substances are taken by digging, distinguished from the pits from which stones usually are taken and which are called quarries.' ''

In *Brady* v. *Smith,* 181 N. Y., 178, 73 N. E., 963, 106 Am. St. Rep., 531, 2 Ann. Cas., 636, the court was dealing with a mineral reservation contained in a deed exe-

cuted in 1852. The case was decided in 1905, and is so much like the cause under consideration that we quote therefrom rather copiously, as follows:

"The question presented in the case at bar is whether the exception and reservation in question is broad enough to include a bed of limestone and the open quarrying of the same. So far as we are advised, the question presented is open in this court. It may be well enough to quote once more the reservation to be construed: 'Excepting and reserving therefrom unto the parties of the first part, their heirs and assigns forever, all mines and minerals which may be found on the above piece of land with the right of entering at any time with workmen and others to dig and carry the same away.'

"The first point to be observed is that the word 'minerals,' as used in this reservation, is coupled with 'mines' by the conjunctive 'all mines and minerals.' This shows that the grantor had in mind the reservation of mines and their contents, to-wit, 'minerals.' This is further emphasized by the word 'found,' 'which may be found on the above piece of land.' It appears in the findings that immense boulders and ledges of limestone crop out on the surface of these premises, and it would be a strained and unnatural construction to assume that the language commented upon above refers to stone lying open to the view, and that the same may be removed by open quarrying and blasting, destructive of the surface, under the reservation of 'All mines and minerals which may be found.' We have here qualifying words quite as persuasive and controlling as those that influenced the court in *Armstrong* v. *Lake Champlain Granite Co.*, 147 N. Y., 495, 49 Am. St. Rep., 683, 42 N. E., 186.

150 Tenn.—28.

"The reservation of John La Farge must be read as referring to minerals in mines found, with the right to enter at any time with workmen and others to dig and carry the same away; that is, dug out of the earth by means of mines and mining. *Darvill* v. *Roper,* 3 Drew, 294. The word 'dig' has a technical meaning, when the context is considered, and does not apply to open quarrying and blasting.

"It is true, under scientific definition, the world of matter is divided into three general subdivisions—animal, vegetable, and mineral. It is equally true that in the ordinary phraseology of mankind a mineral is a word limited largely to metallic substances.

"It is quite impossible to harmonize all that has been written on this subject in the cases and text-books. In construing reservations and grants, it is necessary, if possible, to ascertain the intention of the parties. In many of the English cases, where acts of Parliament were involved, the decision went off on the language employed in the various acts. There are a number of well-considered cases which involve substantially the question here presented.

"In *Countess of Listowel* v. *Gibbings,* 9 Ir. C. L. Rep., 223, under a reservation of 'all mines and minerals,' it was held that limestone was not included in the reservation. The learned judge, writing in that case, said: 'I do not deny that, if it appeared clearly to be the intention of the parties, to be collected from the instrument, that limestone quarries should pass by the words "mines and minerals," they might pass; but words are to be understood in their natural and usual meaning, unless there be a clear indication that they are, in a particular

case, intended to have a more or less extended significated. Usually, "mine" imports a cavern or subterraneous place, containing metals or minerals, and not a quarry, and "minerals" mean ordinarily metallic fossil bodies, and not limestone.'

"In *Brown* v. *Chadwick*, 7 Ir. C. L. Rep., 101, under a reservation of 'all mines, minerals, and other royalties whatsoever,' it was held not to include open limestone quarries. The learned court said, at page 108: "The distinction between a mine and a quarry appears to me to be this—a mine is a place where the substratum is excavated, but the surface is unbroken; whereas in a quarry the surface is opened, and the material, in the present case limestone, is exposed and raised.'

"In *Darvill* v. *Roper*, 3 Drew., 294, under a reservation of 'mines of lead and clay and other mines and minerals,' it was held that limestone was not included within the reservation; it was further held that minerals meant substances of a mineral character, which could only be worked by means of mines, as distinguished from quarries. The learned court pointed out in this case that if the scientific definition of the word 'minerals' was applied it would mean 'every portion of the soil, not merely the limestone rock; but the gravel, the pebbles, all, even to the very substance of the loam or mold which forms the soil, would be included.' The court also rejected the second meaning, often attributed to the word 'minerals' as a metalliferous substance, for the reason that it was not broad enough to meet the questions presented, in conveyances and leases. The court then uses the following language: "There is, then, a third sense in which the word "minerals" may be used, viz. all such substances

as are dug out of the earth by means of a mine, a meaning which, without being opposed to the other senses, is in accordance with the derivation and etymology of the word; for whatever may be the origin of the word ''mine,'' minerals is clearly derived from mines. A mineral is, etymologically, properly a substance dug out of the earth by means of a mine.'

''It is thus apparent that each case must be decided upon the language of the grant or reservation, the surrounding circumstances and the intention of the grantor; if it can be ascertained. The adoption of arbitrary definitions in reference to mineral substances buried in the earth is not permissible. The word 'mineral' standing by itself might, under a broad, general, popular definition, embrace the soil and all that is to be found beneath its surface. Under a strict definition it might be limited to metallic substances, and under a definition coupling it with mines it covers all substances taken out of the bowels of the earth by the process of mining.

''We are of opinion that, under the exception and reservation in question, John La Farge did not reserve the right to himself, his heirs and assigns forever to the limestone on the premises conveyed, and to conduct open quarrying for the purpose of taking possession thereof.''

Counsel for defendant cite in their brief a number of decisions dealing with State, and especially federal, statutes authorizing the entry of mineral lands. These cases are not analogous to the one under consideration, and are decided under different rules of construction.

It is conceded that, in a technical sense, the word ''minerals'' includes limestone.

One of the cases cited by counsel for defendant is
*Northern Pac. R. Co.* v. *Soderberg,* 188 U. S., 530, 23 S.
Ct., 368, 47 L. Ed., 575. We quote several excerpts from
that opinion as follows:

"The word 'mineral' is used in so many senses, de-
pendent upon the context, that the ordinary definitions
of the dictionary throw but little light upon its signifi-
cation in a given case. Thus the scientific division of all
matter into the animal, vegetable or mineral kingdom
would be absurd as applied to a grant of lands, since all
lands belong to the mineral kingdom, and therefore
could not be excepted from the grant without being de-
structive of it. Upon the other hand, a definition which
would confine it to the precious metals, gold and silver,
would so limit its application as to destroy at once half
the value of the exception. . . .

"A division of lands into agricultural and mineral
would also be a most uncertain guide to a proper construc-
tion of the word 'mineral,' since most of the lands included
in the limits of this grant are neither one nor the cther,
but desert or rocky land, of no present value for agricul-
ture, and of little value for their mineral deposits. . .

"In construing this grant, we must not overlook the
general principle announced in many cases in this court,
that grants from the sovereign should receive a strict con-
struction, a construction which shall support the claim
of the government, rather than that of the individual.
Nothing passes by implication, and, unless the language
of the grant be clear and explicit as to the property con-
veyed, that construction will be adopted which favors the
sovereign, rather than the grantee."

The rule of construction just quoted is the reverse of that to be applied in a case like the one under considera-- tion, and, in many instances, would produce a different result.

Another case relied upon by defendants is that of *State of Washington ex rel. John D. Atkinson, Attorney General,* v. *Ernest E. Evans,* 46 Wash., 219, 89 P., 565, 10 L. R. A. (N. S.), 1163. The question involved and the decision of the court is contained in the syllabus, which is as follows:

"Land containing deposits of limestone, silica, sili- cated rock, and clay, which are valuable for the manufac- ture of cement, is within the constitutional provision per- mitting aliens to purchase lands containing valuable de- posits of minerals, metals, iron, coal, and fire clay."

Now, construing the statute involved in the case last cited, under its surrounding circumstances, throws no light upon the intention of these parties, in excluding mineral rights in a conveyance executed in 1870. Under modern conditions, such reservations as were here used might be given a different interpretation. A case might arise where we could give the word "mineral" the con- struction here contended for. But, as said by all of the authorities, each case must be determined upon its pe- culiar facts, giving due consideration to the intention of the parties.

Under the facts of the present cause, we are clearly of the opinion that Mr. King did not intend to reserve the limestone constituting this boundary of land.

Campbell v. Tenn. Coal, Iron & R. Co.

The chancellor having taken a contrary view, it results that his decree will be reversed, and a decree will be entered here for complainant.

The cause will be remanded for an accounting, as prayed for in the bill.

The defendant will be taxed with all costs.