**STATE of Tennessee**

v.

**LAHIERE–HILL, L.L.C.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

June 18, 2008 Session.

July 31, 2008.

---

1. This is expressed in recent cases as "justice delayed is justice denied", e.g., *Goldberg v.* *Goldberg,* 1995 Tenn.App. WL 9309.

Elizabeth P. McCarter, Senior Counsel, Office of the Attorney General, Environmental Division; Wilson S. Buntin, Assistant Attorney General, Office of the Attorney General, Environmental Division;

Michael E. Moore, Solicitor General; and Robert E. Cooper, Jr., Attorney General and Reporter, Nashville, Tennessee, for the appellants, State of Tennessee ex rel. Robert E. Cooper, Jr., in his official capacity as the Attorney General and Reporter of Tennessee, and James H. Fyke, Commissioner of the Tennessee Department of Environment and Conservation.

Frederick L. Hitchcock and Michael J. Stewart, Chattanooga, Tennessee, for the appellee, Lahiere–Hill, L.L.C.

Sarah A. Francisco, Charlottesville, Virginia, and Gregory Buppert, Nashville, Tennessee, for the amici curiae, the Cumberland Trail Conference, the Tennessee Citizens for Wilderness Planning, Save Our Cumberland Mountains, the Sierra Club, the Tennessee Clean Water Network, the Nature Conservancy, the Obed Community Watershed Association, the American Hiking Society, the Tennessee Parks and Greenways Foundation, the Tennessee Forests Council, the Land Trust for Tennessee, the National Parks Conservation Association, Cherokee Forest Voices, and the Tennessee River Gorge Trust.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

The State of Tennessee ("the state") sued Lahiere–Hill, L.L.C. ("the company"), seeking a declaratory judgment defining the scope of the company's rights with respect to the minerals on several tracts of land in Hamilton County. The state, which owns the surface rights to the land in question, also stated causes of action for trespass, ejectment and public nuisance. The severance of the mineral rights from the surface rights occurred in 1951, when the parties' common grantor reserved the

mineral rights for itself while conveying the surface rights to a grantee who wished to use the land for its timber. The state eventually acquired the surface rights previously owned by timber companies, and has designated most of the land as part of the Cumberland Trail State Park. The parties' dispute focuses on how to interpret the 1951 deed, specifically whether the grantor's reservation of "other minerals" includes the right to mine sandstone. The state contends that sandstone is not a mineral, and that, in any event, the company's "surface mining" is too destructive to the surface and should not be allowed absent an explicit provision in the deed permitting such mining. The company argues that sandstone is a mineral, and that the mining techniques at issue are not so destructive as to deprive the state of its surface rights. The trial court granted the company's motion for summary judgment, holding that the term "minerals" unambiguously includes sandstone; determining that there are no disputed issues of material fact in this case; and concluding that the material facts before the court support summary judgment for the company. We disagree with the trial court's determination that there are no genuine issues of material fact. We hold that, absent an explicit provision so stating, the 1951 deed cannot be read as waiving the surface owner's right to use the property for its reasonable or intended purpose. We further hold that the company has not demonstrated the absence of a disputed issue of material fact on the question of whether its mining techniques are impermissibly destructive. Accordingly, we vacate the trial court's grant of summary judgment and remand for further proceedings.

## I.

In August 1951, the parties' common grantor, Durham Land Company, conveyed title to the surface rights in the subject property to Efim Golodetz.[1] After describing the boundaries of the subject property, known as the "Deep Creek Tract," the deed lists four "exceptions" and then states:

> Durham Land Company hereby also expressly saves and excepts out of the property hereinabove described and from the grant thereby made, and reserves to itself, its successors and assigns, all mines, coal, iron, oil, gas and *other minerals of whatsoever kind or character* in and under said above described property, with full and free power to take all usual, necessary and convenient means for searching for, mining, working, getting, preparing, carrying away, and disposing of said mines and minerals; and excepting all existing public roads and the easements of public utility companies across said above described property; and excepting and reserving to Durham Land Company, its successors and assigns, full and free rights and liberty at all times hereafter in and to rights of way over and across said above described property for ingress and egress for all purposes connected with the use, occupation, and enjoyment of the property and rights hereinabove saved, excepted and reserved.

(Emphasis added.)

Having reserved the Deep Creek mineral estate for itself, Durham Land Company

---

1. A total of eight tracts were conveyed in the deed, three of the tracts—including the subject property, described in the deed as the "Durham Land Company–Deep Creek Tract"—from Durham Land Company to Mr. Golodetz, and the other five from C.W. and Claudia Hoffman to Mr. Golodetz. The eight tracts were sold for a combined $300,000, "payable to the order of Durham Land Company and C.W. Hoffman." (Capitalization in original omitted.)

subsequently conveyed that estate to Joseph and Josephine Lahiere in 1963.[2] The relevant portions of the 1963 deed[3] state that the conveyance includes "[a]ll mines, minerals, and mining rights under the surface" of the conveyed properties, as well as "[a]ll of the mineral, mining rights, powers, privileges, easements, rights-of-way, and all other rights of whatsoever extent, kind, and character as reserved and kept by Durham Land Company" in the 1951 deed. Subsequently, in 1973, Elmer Hill obtained a partial interest in the Lahieres' mineral estate, thus resulting in the estate's joint ownership by what eventually became the Lahiere–Hill partnership, and later, Lahiere–Hill, L.L.C., the defendant and appellee herein.

Meanwhile, Efim Golodetz, the 1951 surface-estate grantee, conveyed *his* rights in the subject property to Namarib Timber Company in 1973, which in turn conveyed the same estate to the Hiwassee Land Company in 1974, another timber company. Hiwassee later merged into Bowater Inc., which subsequently conveyed its interest in the subject property to the state.[4] By 2004, the state owned the surface estate covering all of the Deep Creek Tract property at issue herein. Much of that property is now part of the Cumberland Trail State Park, which the state describes as "Tennessee's only linear park." There is no dispute regarding the chain of title, and the parties agree that the 1951 deed accurately describes the parties' interests in the property in question.[5]

Both parties and the trial court focus their attention on the interpretation of the language in the 1951 deed that describes the reserved mineral rights as covering "all mines, coal, iron, oil, gas and *other minerals of whatsoever kind or character* in and under said above described property." (Emphasis added.) The company argues that sandstone, which it mines to

2. The trial court stated in its memorandum opinion and order that the subject property was included in an earlier Durham–to–Lahiere conveyance, in 1962. This appears to be incorrect, however. The 1962 deed included some of the tracts covered by the 1951 deed, but our review of the record indicates that the Deep Creek Tract was not conveyed until 1963. In any case, it makes no material difference to the outcome of the case, as the wording of the 1962 and 1963 deeds is essentially identical, and there is no dispute that the parties' interests are described accurately by the 1951 deed.

3. The 1963 deed conveyed not just the subject Deep Creek Tract, but also various other mineral and surface estates owned by either the Durham Land Company or the Mary Glen Land Company. The Deep Creek Tract is included within the portion of the deed described as "Mineral Tract No. 1," which itself comprised "the mineral and mining rights of various tracts being consolidated into an overall contiguous tract." The Deep Creek Tract is also mentioned under "Miscellaneous Item No. 1," which essentially reiterates and clarifies the rights conveyed in earlier portions of the deed. (Capitalization in original omitted.)

4. This is a slight simplification of a more complex series of transactions. In 2001, Bowater conveyed various properties to the state, and conveyed various other properties to The Conservation Fund. Then, in 2004, the Conservation Fund conveyed various properties to the state. It is not clear from the trial court's opinion, the parties' briefs, or our review of the record, precisely when and how the Deep Creek Tract—which is not identified as such in the deeds to the state—changed hands. Again, however, this detail is immaterial, as there is no dispute over the chain of title.

5. The state argues that the 1963 grant, although it "included the very same mineral interest that was reserved by Durham in 1951," is significant because it uses the phrase "under the surface" rather than the original phrase found in the 1951 deed, "in and under [the] property." We do not regard this difference in wording as significant. Both deeds clearly refer to *sub-surface* mineral rights.

make dimension stone,[6] is covered by the "other minerals" clause; the state contends that it is not. The state also argues that, even if the company has the right under the deed to mine for sandstone on the subject property, it is creating a public nuisance by doing so. Because the issues implicated by the nuisance claim are in some senses different from the issues implicated by the other claims, we will discuss that claim separately at the end of this opinion. In any event, the company was granted summary judgment on all claims. The state timely appealed.

## II.

### A.

Summary judgment may properly be granted only where the moving party demonstrates that, viewing the evidence in the light most favorable to the nonmoving party and making all reasonable inferences in the nonmoving party's favor, no genuine issue of material fact exists. *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 342 (Tenn.2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn.2001); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn.2001). An order granting summary judgment is not entitled to a presumption of correctness on appeal. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn.2002). Instead, we must determine for ourselves whether the moving party has satisfied the requirements of Tenn. R. Civ. P. 56. *Hunter v. Brown*, 955 S.W.2d 49, 50–51 (Tenn.1997); *Cantrell v. DeKalb County*, 78 S.W.3d 902, 905 (Tenn.Ct.App. 2001). This determination is based upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Tenn. R. Civ. P. 56.04. The grant of summary judgment may be upheld only if "the moving party is entitled to a judgment as a matter of law on the undisputed facts." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).

The moving party, in this case the company, has the initial burden, and "must either affirmatively negate an essential element of the non-movant's claim or conclusively establish an affirmative defense." *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn.1998). In the instant case, the company seeks to affirmatively negate the state's claim that its surface estate includes the right to prevent the company from mining sandstone on the subject property.[7] Only if the company has succeeded in negating that claim is the state required to produce evidence to support its position, whether by rehabilitating its evidence, pointing to new or overlooked evidence, or proving that further discovery is necessary. *Id.* In other words, unless the facts presented by the company in support of its motion for summary judgment are sufficient to establish that the company's mineral estate includes the right to mine sandstone by the proposed method, the motion must fail, regardless of whether the state has presented any contrary evidence.

### B.

Courts have struggled over the years to find a sensible approach to interpreting deeds that reserve a broadly defined set of "mineral" rights. The United States Su-

---

6. As stated in the company's brief, "[d]imension stone is stone selected or cut to specific sizes for use in building or landscaping. The parties agree that the resource being removed is sandstone dimension stone."

7. This is an essential element of all the state's causes of action except its public nuisance claim, which, as noted earlier, we will discuss separately at the end of this opinion.

preme Court in 1903 noted that "[t]he word 'mineral' is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case." *Northern Pac. Ry. Co. v. Soderberg,* 188 U.S. 526, 530, 23 S.Ct. 365, 47 L.Ed. 575 (1903). In 1924, the Tennessee Supreme Court—in a decision upon which the state relies heavily—discussed a variety of factors that might be relevant in determining whether the parties to a deed regarded limestone as a mineral when they agreed to a reservation of "all the mines or minerals contained or imbedded in or on said tract." *Campbell v. Tennessee Coal, Iron & R. Co.,* 150 Tenn. 423, 265 S.W. 674, 676 (1924). The Court noted that limestone "had no commercial value" at the time of the subject deed, a fact which the Court regarded as militating against the substance's classification as a mineral. Indeed, the Court mused that "[u]nder modern conditions ... [a] case might arise where" limestone, having become commercially valuable, would be considered a mineral. *Id.* at 678. However, the Court *also* emphasized that allowing the mining of limestone, on *Tennessee Coal's* facts, would essentially have resulted in the destruction of the surface owner's rights—a factor that would *not* necessarily vary between older and more "modern" deeds. The Court wrote:

> If this reservation be construed to include limestone, it destroys the conveyance, for by quarrying the limestone the entire surface would be made way with. This being wholly a limestone proposition, it is most reasonable to suppose that Mr. King would have reserved same by express terms, had such been his intention.

*Id.* at 676. In addition, the court also considered various possible definitions of "mineral," and concluded that they are in conflict with one another:

> The word 'mineral' standing by itself might, under a broad, general, popular definition, embrace the soil and all that is to be found beneath its surface. Under a strict definition it might be limited to metallic substances, and under a definition coupling it with mines it covers all substances taken out of the bowels of the earth by the process of mining.

*Id.* at 677. Ultimately, having noted these various potential factors, the Court simply announced, without stating its precise rationale, that "[u]nder the facts of the present cause, we are clearly of the opinion" that limestone was *not* intended to fall within the definition of "mineral" in the 1870 deed at issue in that case. *Id.* at 678. The court emphasized that "each case must be determined upon its peculiar facts"—including "the language of the grant or reservation, the surrounding circumstances and the intention of the grantor, if it can be ascertained"—rather than a formulaic or technical definition of the terms involved. *Id.* at 677, 678.

Both parties in this case, however, leaned heavily in their summary judgment evidence on what might be called technical definitions. In its Statement of Material Facts accompanying its Motion for Summary Judgment, the company supported its assertion that "sandstone ... is a mineral" with the testimony of Linda Main, a geologist, who stated in part that "the definition of a mineral is a naturally-occurring substance that's inorganic, but the characteristics of it are like they are a chemical compound"—a definition, she says, that includes sandstone. The state responded with an affidavit from its own geologist, Peter J. Lemiszki, asserting that sandstone is *not* a mineral because it does not have a "definite chemical composition," but rather is "a sedimentary rock that consists of individual grains of sediment held together by cement," the "size and

composition" of which may vary. This, according to Dr. Lemiszki, is in stark contrast to minerals, which are "homogeneous in nature and are distinct from mixed heterogeneous assemblages, such as rock."

The company also offered as evidence a report prepared by the state's Division of Geology titled "The Mineral Industry of Tennessee," apparently published in 1998. This report, in the company's words, "lists dimension stone and quartzite sandstone as minerals located in Tennessee and processed commercially." Asked about its contents, the company's expert, Dr. Main, said the report "kind of affirms that [sandstone] is considered a mineral, because it's a commodity where [sic] they produce for money."

The latter definition of mineral—a subsurface commodity with financial value—appears to have been the one adopted by the trial court, which stated in its memorandum opinion and order:

> From the deed's particular language, the types of parties involved, and the commercial context of the transaction, it seems "mineral rights" were probably understood, in a generic sense, to include rights in *anything that could be removed from [in] or under*[8] *the property for commercial use.*

(Emphasis and footnote added.) In announcing this definition, however, the court did not explicitly rely upon Dr. Main's testimony, nor upon the Division of Geology report. Instead, the court stated that it was deciding "a question of law ... rather than a factual question," and declared that sandstone is *unambiguously* within the ambit of the deed's "other minerals" provision because "the popular understanding of 'mineral' includes sandstone." In support of this conclusion, the court cited a dictionary definition of "mineral" from 2007, and also referenced earlier deposition testimony by Dr. Lemiszki in which the geologist had acknowledged that, notwithstanding his own contrary scientific opinion, some textbooks and state and federal geology documents refer to sandstone as a mineral. "It would be fair to say," the court wrote, "that a [layperson] would believe sandstone to be a mineral if they relied upon the USGS Mineral Industry Summary to determine where commercially viable mineral[s] exist[ ]."

The trial court also cited the Tennessee Mineral Surface Mining Law of 1972, Tenn.Code Ann. § 59–8–202(7)(B), as advancing a broad definition of "mineral" that would include sandstone. In addition, the court cited Attorney General Opinions from 1997 and 2004, which interpreted statutes written in 1982 and 1984, respectively, as endorsing a similarly broad definition of the word mineral. Tenn. Op. Atty. Gen. No. 97–068, 1997 WL 289935 (May 12, 1997); Tenn. Op. Atty. Gen. No. 04–152,[9] 2004 WL 2505507 (October 7, 2004); Chapter 270, Private Acts of 1982; Tenn.Code Ann. § 67–7–202(a). As for the geologists, the court dismissed Dr. Lemiszki's affidavit as advancing a "super-technical, scientific definition" that is "not ... helpful in understanding what the intentions of the parties to the 1951 deed were." The court did not address whether the portions of Dr. Main's competing testimony regarding the scientific definition of "mineral" are likewise overly "super-technical [and] scientific." Indeed, Dr. Main's testimony regarding the definition of "min-

---

**8.** The court's opinion, as typed, uses the phrase "from or under." This, of course, does not make grammatical sense, and is presumably a typographical error. We assume the court intended to mirror the "in and un-

der" language of the deed by using the phrase "from in or under."

**9.** This opinion was erroneously cited by the trial court as No. 04–142.

eral" is not mentioned at all in the court's opinion, though the court had previously relied upon it in an earlier opinion denying the state a temporary injunction, in part on the ground that "it appears that the State has not proved that the [sand]stone is not a mineral."

We agree with the court that a broad reservation of "other minerals" should not be artificially constrained to include only those particular materials that the grantor and grantee had specifically in mind when they wrote the deed. The phrase in question is, after all, worded as a "catch-all," intended on its face to include any and all minerals that the original parties to the deed did *not* specifically consider.[10] That said, the word "minerals" still must mean *something*. The "catch-all" is not unlimited; it applies only to *minerals*, and that word must be defined somehow. Given the lack of direct evidence of the original parties' intent, we think the court was right to focus on whether "the popular understanding of 'mineral' includes sandstone"—or, more precisely, on whether the popular understanding of "mineral" *in 1951* included sandstone, or substances similar to sandstone—rather than basing its judgment on "super-scientific" definitions. The question, after all, is what "mineral" means in the particular context of the deed in question—*i.e.*, what it meant to these parties—not what "mineral" means in the abstract. As stated in *Tennessee Coal*, "each case must be determined upon its peculiar facts." 265 S.W. at 678. So unless there is some reason to believe that the grantor and grantee relied upon a "super-technical, scientific definition," such a definition is not dispositive or even terribly relevant, and the "popular"

definition is much more important, as it represents the "plain and ordinary meaning" of the words in question.

By the same token, we are not entirely certain of the relevance of statutes and Attorney General opinions from the 1970s and later, nor that of various modern textbooks, state and federal documents, and so forth. It could perhaps be argued that these sources can shed light in a very general sense on what the popular definition of "mineral" *has historically been*, but sources that are more closely contemporaneous to the 1951 deed would certainly be more helpful. Furthermore, we have grave doubts regarding the court's conclusion that the definition of "mineral" in this context is *unambiguous*, and can be decided as a matter of law, not of fact. This is particularly so given that the court cited factual evidence in support of its conclusion. That said, ultimately we need not reach these issues, as will be seen.

## C.

■ Regardless of how one defines "mineral," the court clearly erred in concluding that there is no disputed issue of material fact as to whether the particular method of sandstone extraction at issue herein falls within the ambit of the deed's mineral reservation. The case law, while somewhat muddled on the question of how to define "mineral," is clear on this different but related point: general mineral reservations in a deed will not be construed so broadly as to include extraction methods that destroy the surface rights conveyed in the same deed. If a grantor wishes to retain the right to obtain minerals through destructive surface extraction,

---

**10.** This conclusion follows naturally from the wording of the reservation: "coal, iron, oil, gas and other minerals." The parties to the deed listed four particular minerals—coal, iron, oil and gas—that they specifically intended to include in the reservation. Then they added the phrase "other minerals," to include any and all minerals that they had *not* specifically delineated.

he must explicitly reserve that right within the deed; a general mineral reservation will not suffice.

This rule is announced not only by *Tennessee Coal*, 265 S.W. at 676—which, as noted earlier, states that limestone quarrying[11] on a tract of land that is "wholly a limestone proposition" would "destroy[ ] the conveyance"—but also by several later cases related to the practice of "strip mining" for coal. *See Doochin v. Rackley*, 610 S.W.2d 715, 719 (Tenn.1981) (deciding, as a threshold question to a constitutional challenge, that "neither the plaintiffs nor their predecessor in title was ever conveyed the legal right to strip mine," despite a broadly worded mineral reservation); *Campbell v. Campbell*, 29 Tenn.App. 651, 199 S.W.2d 931, 933 (1946) (excluding strip mining from general mineral reservation because "the owner of the surface is entitled to subjacent support ... unless the right to such support has been waived or relinquished by the surface owner," and "such a ... waiver should not be implied unless the language of the instrument of conveyance is appropriate therefor and clearly indicates such to be the intention of the parties"). These cases, as well as basic common sense and equity, compel the conclusion that, *even if* sandstone is a mineral, the general mineral reservation in the 1951 deed will not be interpreted as implicitly granting the company the right to destroy the state's surface rights.

The above-cited cases are not distinguishable from the instant case on the basis of divergent deed language. Of course the language of the deeds in the various cases is not identical, but we do not find the differences to be significant.

For instance, we disagree with the trial court's assertion that the mineral reservation in *Tennessee Coal* is "far narrower" than the reservation in the instant case because the *Tennessee Coal* reservation includes "all the mines or minerals," 265 S.W. at 674, whereas the deed in the case now before us includes "all mines ... and other minerals of whatsoever kind and character." We think the word "all," standing alone, necessarily denotes "of whatsoever kind and character"; the latter is basically surplusage in this context, and certainly does not make the *Tennessee Coal* reservation "far narrower" than the one herein. The deed in *Campbell*, 199 S.W.2d at 933, is also broadly worded, reserving the grantor's rights to "mineral[s] of all kinds ... with sufficient privilege to operate and market the same." Again, we see no substantive difference between that deed and the one at issue in this case. Nor does deed language distinguish *Doochin*, which involved several deeds with varying terms, including reservations of "all oil, gas, coal and any other minerals or mineral substances," and of "all oil, gas, saline and mineral substances of any nature whatsoever." 610 S.W.2d at 716. The *Doochin* deeds also provided the mineral owner with, variously, "full rights to enter [the land], explore for, mine or otherwise procure any such minerals by any proper or necessary means with all necessary rights and ways to remove such products therefrom," or "right of ingress and egress into, over, and under the said land for the purpose of exploring for, producing and removing any of such substances." *Id.* This language is sufficiently

---

11. We recognize that the instant case involves mining rather than quarrying. However, we believe that *Tennessee Coal's* reasoning with regard to general mineral reservations and surface rights is equally applicable to any mineral extraction method that would "destroy[ ] the conveyance," regardless of whether that method is labeled as "mining" or "quarrying." Of course, whether the extraction at issue in the instant case is such a method is a separate question, one that we will address in more detail shortly.

similar to the equivalent language in the deed herein—which grants "full and free power to take all usual, necessary and convenient means for searching for, mining, working, getting, preparing, carrying away, and disposing of said mines and minerals" and also "full and free rights and liberty at all times hereafter in and to rights of way over and across said above described property for ingress and egress"—that we think it is clear these deeds are reserving essentially the same rights. Thus, the prohibition on implied surface-rights waivers found in *Tennessee Coal*, *Campbell* and *Doochin* is equally applicable to this case.

In view of these precedents, the trial court's explication of the company's extraction rights is clearly too broad. The court's memorandum opinion states, in pertinent part, as follows:

> In this case, the method by which Lahiere–Hill, via Mr. Daggett, removes the sandstone does not exceed the scope of the 1951 reservation. The reservation language regarding removal broadly allows the mineral rights holder "full and free power to take all usual, necessary and convenient means for searching for, mining, working, getting, preparing, carrying away, and disposing of said mines and minerals." The plain reading of the reservation ("all usual, necessary and *convenient* means,") shows the parties to the 1951 deed intended to allow the mineral rights holder almost limitless freedom to remove resources from the Property. The sandstone is removed from shallow depths beneath the surface of the land by a bulldozer, but it is mined by shaft. The State does not dispute that this is the method used to extract the sandstone on the Property. Surface mining is the easiest way to remove sandstone. The 1951 reservation allows removal methods that are convenient. Thus, the removal method

currently used is one that is consistent with the intention of the parties to the 1951 deed.

(Emphasis in original; citations omitted.) The trial court, having found sandstone to be a mineral under the subject deed, concludes that the deed gives the company "almost limitless freedom" to extract it (or any other mineral) by any method that is "convenient" for the company. Yet this conclusion *does not follow* from the finding that sandstone is a mineral, because the court's formulation fails to allow for any consideration of how the state's surface rights affect the scope of the reservation. If, hypothetically speaking, "the easiest way to remove sandstone" were a method that destroys the surface entirely—the sandstone equivalent of "strip mining" for coal—the company would necessarily, according to the trial court's logic, have the right to employ this method, since it would be a "convenient means" of removing a "mineral," and "[t]he 1951 reservation allows removal methods that are convenient." Yet such a conclusion would clearly be contrary to the holdings of the strip-mining cases just cited, unless one concludes that this deed's use of the word "convenient"—emphasized by the court— is tantamount to an explicit waiver of surface rights by the grantee. We do not think this is a reasonable interpretation of that term.

### D.

The trial court's analysis, then, is in error. But our inquiry does not end there. The company argues strenuously that its method of sandstone extraction is *not* equivalent to "strip mining," let alone to quarrying. We are told that the proposed "surface mining" method only minimally disrupts the surface, and therefore is *not* destructive to the point of interfering with the state's surface rights. If the company

had established these facts for summary judgment purposes, then the trial court's analytical error in neglecting the surface-rights exception to general mineral reservations would be a harmless mistake.

Before proceeding to determine whether the company has met this burden, it may be helpful at this point to take a step back and briefly review the procedural posture of this case. In moving for summary judgment, the company sought to prove that it has the right, by way of the 1951 deed, to engage in the proposed mineral extraction. If the company could prove this, it would negate an essential element of the state's claims for declaratory judgment, trespass and ejectment. However, in accordance with the above-cited strip-mining precedents, the company must do more than demonstrate that sandstone is a "mineral" and that the proposed extraction method is "usual, necessary and convenient." The company must *also* prove that the proposed extraction method does not unduly interfere with the state's surface rights. Otherwise, the company has not negated any essential element of the state's claims, because it has not proven that the state lacks grounds, under the deed, to halt the company's activity.

We emphasize that the inquiry into the extraction method's intrinsic destructiveness is analytically distinct from any potential inquiry into whether, in a particular instance, unexpected or unforeseen damage may have occurred (though individual examples of damage may certainly be pertinent to the broader inquiry). Moreover, the destructiveness inquiry is *also* analytically distinct from the question of whether the company is employing the "usual, nec-

essary and convenient means for searching for, mining, working, getting, preparing, carrying away, and disposing of said mines and minerals." [12] That latter question is a *secondary* inquiry, which begins only *after* the company's right to extract "said mines and minerals" has been established. By contrast, the inquiry into whether the extraction method inherently violates the state's surface rights is part and parcel of the *initial* determination of whether a "right to extract" exists at all. If the extraction of the substance in question—in this case sandstone—is necessarily so destructive of the mined surface area as to essentially "destroy[ ] the conveyance" of the surface rights to that area, *Tennessee Coal*, 265 S.W. at 676, then the company *does not have the right* to perform the proposed extraction at all, regardless of whether the substance is a "mineral," and regardless of whether the extraction method is the "usual, necessary and convenient means" of removing said mineral. Even if, on such facts, the company only intends to extract sandstone from a very small percentage of the property (and thus destroy only a very small percentage of the surface area), it still cannot do so because the deed, in such a scenario, does not convey any right to do so.

A crucial question, of course, is what it *means* to unduly interfere with the state's surface rights—*i.e.*, at what point is the damage so extensive as to "destroy the conveyance" of the surface rights. Certainly, some minor, repairable damage and general, temporary interference with the surface owner's rights must necessarily be allowed, as the "usual, necessary and convenient means" and the "ingress and egress" clauses make clear. But, just as

---

**12.** Consequently, the recitation in *Sherrill v. Erwin*, 31 Tenn.App. 663, 220 S.W.2d 878, 881 (1948), of the principle that "the mineral estate carries with it the right to use so much of the surface as may be reasonably necessary to reach and remove the minerals," is inapposite. The matter at issue herein is the *scope of the mineral estate itself*, not the extent to which the mineral owner may incidentally use the surface in order to *access* that estate.

clearly, there must be some upper limit to the extent of surface damage that can be tolerated without a specific waiver of surface rights. We believe the proper standard is one of reasonableness, as seen through the prism of the original parties' intentions. The intent of the parties, after all, remains the lodestar of deed interpretation, and is the reason for this whole surface-rights inquiry: we are trying to obey the original parties' intentions by declining to retroactively infer an implicit waiver of surface rights that the surface owner cannot reasonably have intended. Accordingly, it is sensible to return to the parties' intent in defining the scope of permissible surface damage.

The mineral owner does not have the right, under a general mineral reservation such as this one, to extract substances in a manner that would cause serious, long-term interference with the uses of the surface that the original parties to the deed intended, or with the uses that a reasonable landowner in the surface owner's position would be expected to make of the property. Thus, in general, since " '[s]urface' means that part of the land which is capable of being used for agricultural purposes," *Murray v. Allard*, 100 Tenn. 100, 43 S.W. 355, 358 (1897), it would be unreasonable to presume (again, absent a specific provision to the contrary) that the surface grantee intended to accept a conveyance that would deprive him of reasonable agricultural use of his land. More specifically, in the instant case, given that the court found that "[t]he basic intention of the parties was to sever the surface and mineral rights to the real property in order to develop the timber and mineral resources separately," we will not interpret the deed as allowing the company to destroy the very timber resources that the grantor conveyed to the grantee. If the proposed sandstone extraction would, by its nature, result in significant damage or destruction to trees in the mined area, then it is clearly outside the scope of what the original parties intended, and we must conclude that the deed does not allow it.

There is some suggestion in the record that the extraction method in question may in fact seriously harm trees on the surface. The state attached, as an exhibit to its supplemental answers to the company's first set of interrogatories,[13] a report by the state Department of Environment and Conservation which states that "[p]erhaps the most quantitative loss" caused by the company's activities is the

> complete destruction of the forest in rock 'extracting' areas (as observed), the trees are pushed aside and the soil left in a condition where specimen trees cannot return for lack of soil depth and nutrients. In just one 100–foot section of harvest area, [eleven] timber sized trees with at least two sawlogs in each were pushed aside to rot[.]

> * * *

> The potential for new hardwood growth has also been reduced or destroyed completely so any future worth of the forest has also been taken away from the surface owner. When all tree values are counted per acre, the amount of timber value is staggering.

The company disputes the factual accuracy of this assessment, and also contends that the report was untimely filed and should not be considered for purposes of the summary judgment motion. We express no opinion on either point. We simply quote this portion of the record as an *example* of

**13.** These supplemental answers were filed after the company's motion for summary judgment and the state's response thereto, but before the court heard oral argument on the motion and before it granted the motion.

the type of evidence that, if true, would certainly demonstrate impermissible damage (though we do not imply that it is necessarily the best, or only, such evidence). For present purposes, however, we need not even consider the state's evidence, because the company has not met its summary judgment burden, and thus the state's duty to produce evidence in support of its position has not been triggered. *McCarley*, 960 S.W.2d at 588.

As stated earlier, in order to negate an essential element of the state's claim, the company must show that the proposed extraction method does not impermissibly interfere with the state's surface rights. Unless the *company's* evidence, viewed in the light most favorable to the state and making all reasonable inferences in the state's favor, establishes the *absence* of a disputed issue of material fact on this point, the inquiry ends and summary judgment must be denied. As will be seen, the company has failed to meet this burden. The company's argument that the *state* has not presented sufficient evidence on this issue therefore misses the point.

The company's Statement of Material Facts does not even attempt to address the issue of destructiveness to the surface. The only references to the extraction method in that document read as follows:

9. Sandstone dimension stone is mined from the surface or from just below the surface. Sandstone cannot be mined by a shaft method due to the inability to stabilize the shaft wall or hole dug to extract the sandstone. Testimony of Marty Daggett, Transcript at pp. 76–77; Testimony of Linda Main, Transcript at pp. 96, 99–100; April Opinion at p. 9.

\* \* \*

14. Daggett's operations on the Lahiere–Hill Property are employing the usual, necessary and convenient means for searching for, mining, working, getting, preparing, carrying away, and disposing of sandstone dimension stone on the Lahiere–Hill Property. Testimony of Marty Daggett, Transcript at pp. 75–93; Testimony of Linda Main, Transcript at pp. 95–104.

Although these statements tend to support the trial court's finding that the extraction method in question is "convenient," they do not speak to the issue of whether that method is so destructive of the surface as to "destroy the conveyance." Nor does the cited evidence address that crucial question. Accordingly, we hold that the company failed to meet its initial burden as the moving party seeking summary judgment, and the grant of summary judgment as to the state's declaratory judgment, trespass and ejectment claims must therefore be reversed.

We also reject the company's argument that the state's actions suggest it is engaging in a surreptitious "condemnation" of a mineral estate that it once considered purchasing. Even if the company could prove that it previously rejected an unreasonably low purchase offer for this land by the state, and that this rejection played a role in motivating the state's present actions, such proof would not change the fact that the language of the 1951 deed controls— and has always controlled—the parties' rights to this land. This case turns on a deed interpretation question, not a condemnation question.

### III.

■ That leaves the state's nuisance claim, which requires a far shorter discussion, in light of our findings above. Unlike the claims for declaratory judgment, trespass and ejectment, the success of the state's claim for public nuisance does not necessarily *depend* on the proposition that the company lacks the right to mine for

sandstone on the subject property—but certainly, *dismissal* of the nuisance claim cannot be supported given that the company's ownership right is now once again at issue. This is particularly true given that the trial court's dismissal of the nuisance claim relied in part on the notion that "the removal of sandstone comports with the mineral reservation," and on the related conclusion that "the Defendants have been reasonable, and legal, with regard to their activities."

Furthermore, in any event, the company's aforementioned failure to demonstrate the absence of a factual dispute over the destructiveness of its extraction methods also necessarily dooms its motion for summary judgment on the nuisance claim, since the same facts are equally material to that claim. Accordingly, the grant of summary judgment on this issue was also improper.

### IV.

The judgment of the trial court is vacated. Costs on appeal are taxed to the appellee, Lahiere–Hill, L.L.C. This case is remanded to the trial court for further proceedings, pursuant to and consistent with this opinion.