**Archie V. DUNN and Laurine Dunn, Plaintiffs-Appellants,**

**v.**

**UNITED SIERRA CORPORATION, Cypress Mines Corporation, and Cypress Industrial Minerals Company, Defendants-Appellees.**

Court of Appeals of Tennessee, Western Section.

Oct. 31, 1980.

Application to Appeal Denied by Supreme Court Feb. 2, 1981.

Larry J. Logan, W. H. Lassiter, Huntingdon, and Allen J. Strawbridge, Jr., Dresden, for plaintiffs-appellants.

George C. Thomas, III, Dresden, for defendants-appellees.

SUMMERS, Judge.

This suit was originally filed in the Chancery Court of Weakley County, Tennessee, by the plaintiffs, Archie V. Dunn and wife, Laurine Dunn, by means of two separate complaints against the defendants, United

Sierra Corporation, Cypress Mines Corporation, and Cypress Industrial Minerals Company. Plaintiffs filed a motion to consolidate both cases in order to avoid unnecessary complications and confusion. The motion was granted and a consolidated complaint was filed, then amended and supplemented. The defendants filed an answer to the two original complaints, then filed another answer to the consolidated complaint as amended and supplemented.

In 1934 Bell Clay Company acquired an 80-acre tract of land which is the subject of contention in this lawsuit. In 1950, by warranty deed, Bell Clay Company conveyed 31 acres of the 80-acre tract to the plaintiffs. In 1951, the plaintiffs, as lessors, executed a lease and contract agreement with United Clay Mines Corporation as lessees. The agreement leased the 31 acres earlier purchased from Bell. In 1965 the lease and contract instrument was assigned to the defendants in this case.

In 1963 the plaintiffs Dunn acquired, by warranty deed, the remaining 49 acres of the original 80-acre tract from Bell. In 1967 the plaintiffs and defendants entered into another lease, and the property description in this lease contained and encompassed the entire 80 acres which had originally been owned by Bell. The description in the 1967 lease also included the 31 acres already under lease to the defendants by virtue of the 1951 lease. Mining operations by the defendants did not begin on the leased property until 1968.

In a letter dated February 25, 1974, the plaintiffs notified the defendants that they were terminating both the 1951 lease and 1967 lease due to default in payment. The defendants did not honor the notice of termination and the plaintiffs filed their two lawsuits, which were later consolidated into a single complaint.

In the consolidated complaint, hereinafter referred to as "the complaint," plaintiffs alleged that the two separate leases executed by the plaintiffs and defendants had been breached and were null and void because the leases had been terminated upon the defendant's receipt of plaintiff's letter. The complaint further alleged that if the two leases were not null and void, then the 1967 lease covering the entire 80-acre tract had merged with the 1951 lease of the 31-acre tract, and thus the 1967 lease superseded the 1951 lease.

The complaint further alleged that the plaintiffs had not been fully compensated for the clay and other minerals harvested by the defendants, and also that during their mining operations the defendants had caused damage to the plaintiffs' crops and cropland by negligent flooding.

The defendants denied: that the 1951 lease and the 1967 lease had been terminated by the letter received from the plaintiffs; that the 1951 lease had been superseded by the 1967 lease; and that the defendants had negligently caused damage to the crops and farm land of the plaintiffs. The defendants denied that they were indebted to the plaintiffs in any amount, alleging that they had paid the plaintiffs for all clay sold in accordance with the clay industry's definition of "railroad weights."

On October 19, 1976, the case was heard on its merits by Chancellor Herron. The Chancellor held that the 1951 lease did not merge into the 1967 lease and was not superseded thereby, and that all royalty payments had been correctly calculated according to the provisions of the two leases. The Chancellor further ruled:

That the term 'railroad weights' included in both the 1951 and 1967 Leases means that the royalties paid to the plaintiffs should be based upon that portion of clay that was useable and processed to the point required by the customers of the defendant, the weight of which was determined by the railroad weight tickets and the truck weight tickets, that, therefore, the defendants fulfilled its [sic.] obligation to the plaintiffs when the defendant paid the plaintiffs for all of their clay that were [sic.] shipped to the customers; and that the royalties to be paid under the Lease of the plaintiffs applied only to merchantable clay and did not apply to sand and other impurities.

The Chancellor also held that the letter mailed by the plaintiffs to the defendants did not terminate either lease.

As to the questions of crop damage and whether the defendants had paid to the plaintiffs royalties on all clay shipped, a reference was made to the Master. That reference was as follows:

4. That the question of whether or not the plaintiffs suffered any crop damage by the negligence of the defendant, and if so, the amount thereof, is referred to the Master for determination, and the question of whether or not the defendant had paid the plaintiffs royalties on all clay of the plaintiffs that has been shipped is referred to the Master for determination, who will also determine the amount due the plaintiffs if the Master should find that there was a deficiency, all of which is ADJUDGED and DECREED by the Court.

Oral proof was heard by the Master, who in his report found that the plaintiffs were entitled to damages to their crops for the years 1971 through 1974 in the sum of $5,144.00. The Master found further that no royalty payments had been made by the defendants to the plaintiffs on 106,042.78 tons of clay removed from the mines located on plaintiff's property and placed at defendant's plant for shipment.

Exceptions were filed to the Master's report by the defendants, and Judge Phil B. Harris, then sitting by interchange due to the untimely death of Chancellor Herron, ruled as follows:

The record clearly shows that the Master has exceeded and gone outside of the authority given him by the Chancellor and for this reason the second exception to the Master's Report must be affirmed. The Master's Report of Reference must be confined to the determination of whether or not the defendants had paid to the plaintiffs royalties on the clay that *has been shipped.*

RULING

The exceptions to the Master's Report on Reference, filed on behalf of the defendants is hereby affirmed and the Master's Report is set aside *to the extent stated above.* The Court will hear further proof on this matter limited to (1) the damage to the growing crops sustained by the plaintiff to be computed as of the date the damage was incurred, and (2) whether or not the defendant has paid to the plaintiff royalty on the clay that has been shipped, each as set out in the original order of the Chancellor. This hearing is to be held at the Courthouse in Dresden, Tennessee at 9:00 A.M., Thursday, March 15, 1979.

After the hearing, as ordered, a final judgment was entered awarding crop damage to the plaintiffs in the sum of $3,050.00. The Court held further that the defendants had paid the plaintiffs royalties on all plaintiffs' clay which had been shipped to customers of the clay company, and that the plaintiffs had suffered no damages as to clay payments.

The plaintiffs perfected their appeal from the rulings of the trial court, with the exception that they did not appeal the issue as to crop damages, and assigned the following five issues for review:

1. Was the 1951 lease between plaintiffs and defendants superseded by the 1967 lease?

2. Does a proper construction of the lease/leases require defendants to pay tonnage royalties on that portion of the clay shipped to customers after processing by defendants or on the amount of clay and other materials removed from the leased land prior to processing?

3. Have plaintiffs been fully paid all tonnage royalties to which they are entitled under the terms of the lease/leases?

4. Are lessors (plaintiffs) entitled to a finding that the lease/leases are null and void?

5. Are plaintiffs entitled to recover damages under the so-called "Harsh-Rule?"

This case comes to us for a trial *de novo* upon the record, accompanied by a presumption of correctness of the finding, which requires that the Chancellor's decree be affirmed as to the facts unless a preponderance of the evidence is to the contrary. T.R.A.P., Rule 13(d); *Fletcher v. Russell,* 27

Tenn.App. 44, 177 S.W.2d 854 (1944), and many other cases.

There is very little controversy as to the facts.

■ As a matter of priority the fourth issue will be considered first. The concern of this court with this issue is whether or not the letter written to the defendants by the plaintiffs rendered the 1951 lease and the 1967 lease null and void. The Chancellor ruled that the letter did not terminate the leases because there was no violation or breach by the defendants. We hold that the Chancellor was correct in his holding. The record reveals that payment had been made by the defendants to the plaintiffs, even though the amount of the payments was in controversy. The fourth issue presented for review by the plaintiffs is overruled.

The next issue for this court to consider is whether the 1951 lease between the parties was superseded by the 1967 lease. It is most important to note that the 31-acre tract was a part of the original Bell 80-acre tract; both leases were between the same parties; both leases gave the lessee-companies the right to extract clay and other minerals from the plaintiffs' land; and both leases were prepared by the defendants-lessees for plaintiffs' signatures to be affixed.

The 1951 lease provided that:

(1) The lease would run for a term of 99 years.

(2) The minimum royalty payment would be the sum of $100.00 per year based on a flat royalty obligation of fifteen cents (15¢) per ton of *"clay or other minerals mined and sold."*

The 1967 lease provided that:

(1) The term of the lease was indefinite and depended on payment of royalties by the defendants.

(2) The minimum royalty payment would be the sum of $100.00 per year based on a flat royalty obligation of thirty cents (30¢) per ton of *"clay or other minerals removed from the leased land."*

After the minimum royalty was paid the 1951 lease provided further that payments would be made on the minimum payment basis for clay or other minerals *mined and sold*; whereas the 1967 lease provided for payments to be made for clay or other minerals *removed from the land.* There is a vast difference in the terminology, which would have a tremendous impact on payments made by the defendants to the plaintiffs.

If the 1967 lease of 80 acres included the 31 acres which had been the subject of the 1951 lease, then the 1951 lease was, by operation of law, superseded, or surrendered, by the parties upon the execution of the 1967 lease: the lease at that moment became merged with the 1967 lease. *Harris v. Morgan*, 12 Tenn.App. 445 (1931). Bound up in the latter (1967) lease would be a waiver by each party of the former (1951) lease. *Tennessee Adjustment Service v. Miller*, 54 Tenn.App. 313, 390 S.W.2d 696 (1965). The net result would be that the former lease would be merged into the latter lease.

The 1967 lease embraced the 1951 lease and described the entire tract by metes and bounds. The 1967 lease specified that the lease was for 80 acres and that the 31 acres acquired by plaintiffs from Bell Clay Company were included within the 80 acres conveyed to the plaintiffs by stating that the 31-acre description "... is contained in the foregoing overall description, by inclusion with the larger tract as a whole."

It is well understood that where the language of a contract is plain and unambiguous it is the duty of the Court to interpret and enforce it as it is written, and if disputed language in a contract is ambiguous, or uncertain, it will be construed most strongly against the author. The defendants drafted both the 1951 lease and the 1967 lease. *See Associated Press v. WGNS, Inc.*, 48 Tenn.App. 407, 348 S.W.2d 507 (1961).

Judge Higgins, speaking for the court on the issue of whether an independent agreement between the parties superseded the previous contract in the case of *Frierson v. International Agricultural Corporation*, 24 Tenn.App. 616, 148 S.W.2d 27 (1941), stated:

... We hold that the provisions respecting the payment of royalties and the

clauses bearing upon the obligation to mine, and the prescribing of conditions of forfeiture embraced in the previous contracts were eliminated, and that there was substituted therefore an entirely new arrangement to which effect must be given.

. . . . .

A careful reading of the paper as a whole has convinced us that the intention of the parties was to enter into a new contract. This, like all other questions, is one of intention. When we take into consideration the provisions of the agreement and the situation with which it dealt, confirmed by a long line of conduct, we can reach no other conclusion than that it was the intent and purpose of the parties to stipulate for an entirely different method of payment of royalties, and to change the matter of payments and to substitute certain privileges and *provide certain duties that in every respect were in conflict with those embraced in the previous contract.* (Emphasis supplied)

. . . . .

. . . We are of opinion that this limited reference is of moment in determining the question as to whether the provisions of the old contract were to be kept alive. *If such was the understanding of the parties, why was there not inserted a specific provision to that effect?* Whether a later contract is to be deemed an independent one or to become incorporated with or correlated to the old agreement *is to be determined by the intention of the parties as expressed in the latter agreement. Lewis v. Western Assurance Co.,* 175 Tenn. 37, 130 S.W.2d 982. (Emphasis supplied)

In *McQuiddy Printing Co. v. Hirsig,* 23 Tenn.App. 434, 134 S.W.2d 197, 204 (1939), it is said:

'Deeds are presumed to be made with great caution, forethought and advice.' Beal's Cardinal Rules of Legal Interpretation, 2nd Ed., 142; 2 Blackstone's Commentaries, P. 172.

Also in *McQuiddy, supra,* in regard to oral testimony prior to the execution of an instrument, the court has stated:

All the oral discussions culminated in this written agreement, and are merged into it, and parol evidence is not admissible to contradict or vary it. Beal's Cardinal Rules of Legal Interpretation, 2nd Ed., 143; *Bridges v. Robinson,* 2 Cooper's Tenn.Ch. 720, 723.

'Ordinarily, as between parties and their privies parol evidence is not admissible to contradict or vary the terms of a written contract, and the writing merges all prior oral agreements.' 2 Williston on Contracts, 1217–1225, secs. 630–632; *Litterer v. Wright,* 151 Tenn. 210, 268 S.W. 624.

'The written memorial as interpreted by the law, is, for legal purposes, the sole act of the parties in regard to the matter up to the time of the integration.' 2 Williston on Contracts, 1224, sec. 632.

'The parol evidence rule is "a rule of substantive law which, when applicable, defines the limits of the contract." It is not a rule of evidence, and is of itself not a rule of interpretation.' *Deaver v. Mahan Motor Co.,* 163 Tenn. 429, 43 S.W.2d 199; 2 Williston on Contracts, 1221, sec. 631; 3 Jones on Evidence, 2d Ed., 2695, sec. 1482.

. . . . .

" 'Whatever the law implies from a contract in writing is as much a part of the contract as that which is therein expressed, and if the contract, with what the law implies, is clear, definite, and complete, it cannot be added to, varied, or contradicted by extrinsic evidence. The law conclusively presumes parties to a contract to understand its obligations, and evidence is not admissible to show their understanding to have been otherwise.' 10 R.C.L. 1046–1047, sec. 240; *Litterer v. Wright,* 151 Tenn. 210, 268 S.W. 624."

█ The description in the 1967 lease stated that the 31 acres were included therein and were intended to be a part thereof. The 1967 lease was entered into after negotiations between the parties. No

mining had been performed prior to the drafting of the 1967 lease. The lease was drafted by the defendants. Different terms were contained in the two leases, there being different modes and methods of payment for the clay and other minerals.

Therefore, we must disagree with the holding of the trial court that there was not a merger of the two leases. We must hold that the 1967 instrument speaks for itself and superseded the 1951 lease. At the moment of execution of the 1967 lease, the 1951 lease was superseded, or surrendered, by operation of law.

The first issue raised by the plaintiffs is sustained.

As a result of sustaining the second issue raised by the plaintiffs, we will hereinafter refer only to "the lease," which is a reference to the 1967 lease.

The second issue addressing the court is whether the defendants should have paid tonnage royalties (1) on that portion of the clay shipped by the clay company to its customers after processing or (2) on the amount of clay and other materials removed from the leased land prior to processing.

The lease between the parties states: "Tonnage royalty payments shall be computed upon the basis of railroad weights." The defendants contend that "railroad weights" is a term which is customarily used in the clay industry and which refers to the weight of the clay after processing.

There would be no question in the mind of this court that the defendant's contention might be correct if all weight standards were the same as those contained in the 1951 lease which stated that payment would be made for "clay or other minerals mined and *sold*." Under that agreement if any clay had been sold, the "railroad weights" would have been the weight of the processed clay. The lease stated that payment would be made only for clay and other minerals *mined and sold.* In that instance the term "railroad weights" would have applied only to products *sold* after processing.

In the case at bar, we are concerned with a different set of facts and a different agreement. The lease which had been operative between the parties since 1967 clearly stated that the defendants would pay the plaintiffs thirty cents (30¢) per ton for all *clay or other minerals removed* from the leased land. The clear understanding of this payment term is that the defendants would pay the plaintiffs at the rate of thirty cents (30¢) per ton for all clay and minerals removed from the land of the plaintiffs and placed in a transportation vehicle whether it be a rail car, truck or some other means of conveyance.

It is the contention of the defendants that payment should not be made for sand and lignite. We must hold that lignite is a mineral as well as sand. *See Campbell v. Tennessee Coal, Iron and R. Co.,* 150 Tenn. 423, 265 S.W. 674 (1924). The defendants should pay the plaintiffs for all clay or other minerals removed from the leased land as the 1967 lease so states.

The second issue for review is sustained.

The third issue presented for review is whether or not the plaintiffs have been fully paid for all tonnage royalties to which they were entitled under the terms of the lease (the 1967 lease). We have resolved this question in the first portion of this opinion by holding that the plaintiffs should have been paid at the rate of thirty cents (30¢) per ton for all clay or other minerals removed from the leased lands of the plaintiffs. The record reflects that payment was not made at the rate of thirty cents (30¢) per ton for all clay or other minerals removed from the leased lands of the plaintiffs. Therefore, we must hold that the plaintiffs have not been paid according to their lease agreement.

The third issue presented for review is sustained.

The fifth issue will not be considered by this court because we do not think it is applicable under the facts and circumstances.

Accordingly, we affirm the trial court in the holding that the leases were not ren-

**476**

dered null and void by the letter written by the plaintiffs to the defendants on February 25, 1974.

The trial court is reversed in its holding that the 1951 lease did not merge into the 1967 lease and was not superseded thereby. At the moment of execution of the 1967 lease, the 1951 lease was superseded, or surrendered, by operation of law.

■ The trial court held that "railroad weights" was the portion of clay which was usable and processed to the point required by customers of the defendants. We must hold that the trial court was in error in its interpretation of the term "railroad weights." We must reverse the trial judge and hold that the plaintiffs must receive payment from the defendants at the rate of thirty cents (30¢) per ton (2000 pounds) for all clay and minerals removed from the land of the plaintiffs and placed in a transportation vehicle.

We must also reverse the trial court in its holding that the plaintiffs have been paid royalties on all plaintiffs' clay which had been shipped to customers of the clay company, and that the plaintiffs had suffered no damages as to clay payments. The defendants had always paid the plaintiffs for processed clay. They should have paid for all clay and minerals removed from the land of the plaintiffs and placed in a transportation vehicle.

It is impossible for this court to determine or ascertain from the record the tons of clay or other minerals removed from the leased land; therefore, this case is remanded to the Chancery Court of Weakley County, Tennessee, for a determination by that court as to the tons of clay or other minerals removed from the leased land for which defendants shall make payments at the rate of thirty cents (30¢) per ton and receive credits for payments already made under their "mined and sold" contention. The trial court shall make the adjustment consistent with this opinion.

The costs of this cause, both in the trial court and on this appeal, are taxed against the defendants-appellees for which execution may issue.

MATHERNE and NEARN, JJ., concur.