# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 8, 2017 Session

## TWB ARCHITECTS, INC. v. THE BRAXTON, LLC, ET AL.

**Appeal from the Chancery Court for Cheatham County**
**No. 14181    David D. Wolfe, Chancellor**

_____

### No. M2017-00423-COA-R3-CV

_____

This is the second appeal in a dispute over enforcement of a mechanic's lien. An architect entered into an architect agreement with the developer to build a condominium project in Ashland City, Tennessee. The architect later entered into a purchase agreement with the successor developer to receive a penthouse as "consideration of design fees owed" on the first contract. The architect never received payment for its work and filed suit against the successor developer and its surety to enforce its mechanic's lien for the amount owed under the architect agreement. The trial court held that the purchase agreement was a novation, extinguishing the rights and obligations of the parties under the architect agreement. In the first appeal, this Court found a lack of intent for a novation and, therefore, reversed the decision of the trial court and remanded the case for further proceedings. On remand, after additional discovery, the architect moved for summary judgment on its claim. The trial court granted summary judgment in favor of the architect. In this appeal, the developer argues that the trial court erred in granting summary judgment on its defense of novation and multiple other defenses. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

William Randall O'Bryan, Jr., and Kevin Clayton Baltz, Nashville, Tennessee, for the appellants, Fidelity and Deposit Company of Maryland and The Braxton, LLC.

Donald N. Capparella and Timothy W. Burrow, Nashville, Tennessee, for the appellee, TWB Architects, Inc.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts in this case are summarized in our previous opinion:

On February 17, 2005, Progress Capital Partners, LLC ("Progress Capital") and TWB Architects, Inc. ("TWB") entered into a contract entitled "AIA[1] Document B151-1997, Abbreviated Standard Form of Agreement Between Owner and Architect" (hereinafter "Architect Agreement") for TWB to provide architectural and design services for a mid-rise condominium project in Ashland City known as "The Braxton." The Architect Agreement was signed by John Rankin, Chief Manager of Progress Capital, and by Timothy Burrow, President of TWB. The fifteen-page Architect Agreement outlined, *inter alia*, the architect's responsibilities, the scope of the services, the owner's responsibilities, and the terms of compensation. Pursuant to the Architect Agreement, TWB would be paid a fee of two percent of construction costs or, if the project was not constructed, TWB would be paid by the hour, plus expenses.

On February 9, 2006, The Braxton, LLC was formed with Mr. Rankin as its Chief Manager. On February 16, 2006, Mr. Burrow and The Braxton, LLC entered into a contract entitled "Agreement for Sale of Residence the Braxton Condominiums at Harpeth Shoals" (hereinafter "Purchase Agreement"). In the Purchase Agreement, The Braxton, LLC agreed to sell Mr. Burrow Penthouse P6 in the Braxton Condominiums for "$0 in consideration of design fees owed in the Contract for architectural design between Progress Capital Partners, LLC and TWB Architects, Inc. dated 2/17/05."[2] The Purchase Agreement was signed by Mr. Burrow individually and by Mr. Rankin on behalf of The Braxton, LLC. Construction began on the project in the summer of 2006, and the condominiums were built according to the architectural plans drawn by TWB. As construction progressed, Mr. Burrow invested $39,343.84 of his own money in upgrades to Penthouse P6.[3]

---

[1] "AIA" stands for the American Institute of Architects.

[2] The quoted language was handwritten on the contract.

[3] In order to finance the construction of the condominiums, The Braxton obtained a construction loan from LaSalle Bank, N.A. (later Bank of America). In conjunction with this loan, The Braxton encumbered most of the condominiums, including penthouse P6.

On January 8, 2007, Charles Elcan became a member of The Braxton, LLC. On September 26, 2008, Mr. Rankin surrendered his membership interest in The Braxton, LLC leaving Mr. Elcan as the only member. On October 28, 2008, Mr. Rankin filed a voluntary petition for Chapter 7 bankruptcy. Thereafter, Mr. Burrow requested that The Braxton, LLC convey Penthouse P6 to him. The Braxton, LLC filed a Notice of Completion of the project on December 5, 2008 stating that the "[d]ate of completion of the improvement" was "October 21, 2008." In December 2008, Mr. Burrow moved into the penthouse.

In early 2009, TWB learned that the penthouse was encumbered by a security interest held by Bank of America and that The Braxton, LLC was unable to transfer it to Mr. Burrow free and clear of the encumbrance. On May 8, 2009, the Chancery Court of Davidson County gave a receiver the right of possession to every condominium at the Braxton. Mr. Burrow moved out of the penthouse in late 2009.

It is undisputed that The Braxton, LLC never deeded the penthouse condominium to Mr. Burrow or paid anything to TWB for its architectural services. On February 26, 2009, TWB filed a mechanic's lien in the Register of Deeds Office for Cheatham County. The Notice of Lien Claim stated:

> Timothy W. Burrow, being first duly sworn, says that TWB Architects, Inc., the Lien Claimant, performed certain work or labor in furtherance of improvements to the real property herein described, in pursuance of certain contract with Owners, which owes Lien Claimant $882,526.14 (which is over and above all legal setoffs), for which amount Lien Claimant claims a lien under T.C.A. §§ 66-11-101, *et seq.* on the real property.

On March 11, 2009, TWB filed a Complaint for Foreclosure of Mechanic's Lien against The Braxton, LLC.[4] The complaint alleged a single cause of action to enforce its mechanic's lien and sought to "be awarded a judgment for the amount stated in its Notice of Lien Claim . . . ." On May 6, 2009, The Braxton, LLC filed a counterclaim and argued that the Purchase Agreement served as a novation of the Architect Agreement, extinguishing TWB's right to assert any claims or remedies arising under the Architect Agreement.

---

[4] The complaint was later amended to include Fidelity and Deposit Company of Maryland ("Fidelity") as a defendant. Fidelity is a surety of The Braxton, LLC.

- 3 -

The Braxton, LLC filed a motion for summary judgment on January 4, 2013, asserting that the Purchase Agreement replaced or extinguished the Architect Agreement. On April 19, 2013, TWB filed its own motion for summary judgment. TWB argued that it earned the two percent fee contemplated in the Architect Agreement because The Braxton, LLC used the architectural plans designed by TWB and failed to pay TWB as required under the contract.

On July 11, 2013, the trial court held a hearing on the motion, and by order entered November 18, 2014, the trial court granted The Braxton, LLC's motion for summary judgment. The court made the following pertinent findings:

> (3) At the time of the Architect Agreement and the Purchase Agreement, [Progress Capital], The Braxton and John Rankin were in privity with and alter-egos of one another. Similarly, TWB and Mr. Burrow were in privity with and alter-egos of one another;
> . . .
> (5) When interpreting the Purchase Agreement, the Court must determine the intentions of the parties from the four corners of the agreement, interpreting and enforcing it as written;
> (6) The parol evidence rule restricts the Court from considering prior oral agreement and/or communications that contradict the unambiguous language of the Purchase Agreement;
> (7) If the language is unambiguous, the contract must be interpreted as written, and the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning;
> (8) The Purchase Agreement is clear and unambiguous;
> (9) The Purchase Agreement expressly referenced the Architect Agreement;
> (10) The undisputed facts show that the Architect Agreement had become unworkable and a substitute agreement was necessary for the project to continue;
> (11) The Purchase Agreement was entered into by the parties to salvage a contract that was soon to be breached;
> (12) At the time the Purchase Agreement was executed, the parties were aware that [Progress Capital] could not pay the architect fees owed under the Architect Agreement in cash;
> (13) Accordingly, the Purchase Agreement was unquestionably a novation, which was substituted for the Architect Agreement and, under Tennessee law, extinguished all rights, responsibilities and obligations of the parties under the Architect Agreement.

- 4 -

. . . .

> Accordingly, as a result of these undisputed, material facts, TWB has no rights under the Architect Agreement, and therefore its Complaint, as amended, to Enforce a Mechanic's Lien must be dismissed with prejudice. Furthermore, in light of the foregoing findings, TWB's motion for summary judgment seeking relief under the Architect Agreement must be denied.

*TWB Architects, Inc. v. The Braxton, LLC*, No. M2013-02740-COA-R3-CV, 2014 WL 5502401, at *1-3 (Tenn. Ct. App. Oct. 30, 2014) (some footnotes omitted).

TWB appealed from the trial court's grant of The Braxton's[5] motion for summary judgment. As will be discussed more fully below, this Court found a lack of intent for a novation, reversed the trial court's decision, and remanded for further proceedings. *Id.* at *6.

On remand, in April 2015, The Braxton filed amended answers asserting additional affirmative defenses, including waiver, merger, the parole evidence rule, substitution, fraud, failure to perform, estoppel, detrimental reliance, unclean hands, willful and gross exaggeration of the lien claim amount, payment on the claim, and failure to join an indispensable party. On March 1, 2016, after the parties had engaged in additional discovery, TWB filed a motion for summary judgment asserting that it was entitled to the dismissal of The Braxton's affirmative defenses as a matter of law. In support of this motion, TWB submitted a statement of undisputed material facts and numerous exhibits, including the following:

- Affidavit of Timothy Burrow dated April 19, 2013, with related documents
- Excerpt of deposition of Charles Elcan dated August 27, 2015
- Affidavit of Timothy Burrow dated July 3, 2013, with related documents
- Affidavit of John Rankin dated June 11, 2009, with related documents
- Excerpts of deposition of John Rankin dated November 12, 2015
- Affidavit of Timothy Burrow dated February 22, 2016
- Affidavit of Timothy Burrow dated July 8, 2013
- Excerpt of deposition of Timothy Burrow dated November 11, 2015

The Braxton opposed TWB's motion for summary judgment asserting that there were material issues of fact in dispute. According to The Braxton, novation was a question for the jury because it was dependent upon the parties' intent. It made a similar argument regarding the defenses of substituted performance, waiver, estoppel, unclean hands, exaggeration of the lien claim, and failure to join an indispensable party. The

---

[5] We will refer to the defendants, The Braxton, LLC, and its surety, Fidelity, collectively as "The Braxton."

Braxton denied many of TWB's statements of material fact and submitted voluminous exhibits, including the following:

- Deposition transcript of John Rankin dated March 23, 2010
- Affidavit of Charles Elcan dated February 9, 2010
- Deposition transcript of Timothy Burrow dated November 13, 2009
- Deposition transcript of Timothy Burrow (as Tenn. R. Civ. P. 30.02(6) corporate representative) dated October 19, 2015
- Deposition transcript of John Rankin dated November 12, 2015
- Deposition transcript of Timothy Burrow dated November 11, 2015
- Affidavit Number 3 of Timothy Burrow dated October 2, 2009
- Affidavit Number 2 of Timothy Burrow dated September 30, 2009

TWB submitted a reply to The Braxton's response to its motion for summary judgment reasserting its argument that The Braxton could not meet its burden to establish the affirmative defense of novation or any of the other affirmative defenses claimed. In conjunction with its reply, TWB submitted the July 3, 2016 affidavit of Mr. Burrow.

The trial court held a hearing on TWB's motion for summary judgment on July 8, 2016, and entered a memorandum opinion including findings of fact and conclusions of law on September 13, 2016. (We will summarize the trial court's findings and conclusions as relevant to our discussion below.) In its memorandum opinion, the trial court found that there were no genuine issues of material fact as to any of the defenses raised and that TWB's motion for summary judgment should be granted. In an order entered on October 20, 2016, the trial court granted summary judgment in favor of TWB and entered judgment "for the lien claimed in the amount of $882,526.14 against The Braxton, LLC and against Fidelity and Deposit Company of Maryland as surety jointly and severally." Furthermore, the trial court dismissed The Braxton's counterclaims and entered final judgment pursuant to Tenn. R. Civ. P. 58.

The Braxton filed a motion to alter or amend, which was denied by the trial court on January 25, 2017. The Braxton appeals.

ISSUES ON APPEAL

The Braxton argues on appeal that the trial court erred in granting summary judgment in favor of TWB. In support of this argument, The Braxton raises the following issues:

(1) whether the trial court erred by failing to review the evidence in the light most favorable to the Braxton and to draw all reasonable inferences in favor of The Braxton;

(2) whether the trial court erred by weighing the evidence presented by the parties;

(3) whether the trial court improperly relied on the affidavit of Timothy Burrow;

(4) whether the trial court improperly relied on portions of John Rankin's testimony, while ignoring contradictory testimony supporting The Braxton's affirmative defenses; and

(5) whether a reasonable jury could legitimately resolve the disputed facts in favor of The Braxton and find that one or more of its affirmative defenses (novation, merger, waiver, estoppel, unclean hands, and willful exaggeration of lien) bars TWB's recovery.

STANDARD OF REVIEW

Whether a party is entitled to summary judgment is a matter of law, which means that we review the trial court's judgment de novo, according it no presumption of correctness. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A moving party who does not bear the burden of proof at trial "may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense."[6] *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits,

---

[6] It should be noted that, in cases where the moving party bears the burden of proof at trial, the burden-shifting analysis at the summary judgment phase differs from that set out above. *See Cardinal Health 108, Inc. v. E. Tenn. Hematology-Oncology Assocs., P.C.*, No. E2015-00002-COA-R3-CV, 2016 WL 158090, at *2 (Tenn. Ct. App. Jan. 14, 2016). Thus, "a plaintiff who files a motion for partial summary judgment on an element of his or her claim shifts the burden by alleging undisputed facts that show the existence of that element and entitle the plaintiff to summary judgment as a matter of law." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 n.6 (Tenn. 2008) (*overruled by Rye*, 477 S.W.3d at 264)). Although *Rye* overruled *Hannan* "as applied to all cases where the moving party who does *not* bear the burden of proof at trial files the motion," the *Hannan* summary judgment standard still applies where the plaintiff files the motion for summary judgment. *See Cardinal Health*, 2016 WL 158090, at *2 n.1. However, BTW's motion for summary judgment focuses solely upon The Braxton's defenses, issues for which The Braxton bore the burden of proof at trial. Therefore, the burden-shifting analysis should be that for a party who does not bear the burden of proof at trial, as discussed in *Rye*. *See Rye*, 477 S.W.3d at 264.

depositions, or responses to interrogatories that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. When the moving party fails to make the required showing, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

In determining whether a party is entitled to summary judgment, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 84 (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley*, 960 S.W.2d at 588). A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

ANALYSIS

The overarching issue in this case is whether the trial court erred in granting summary judgment in favor of TWB. That motion was based upon the dismissal of The Braxton's affirmative defenses, which we will address in turn. We begin, however, with the key undisputed facts. There is no dispute that Progress Capital Partners and TWB entered into an enforceable Architect Agreement providing that TWB would be paid a two percent fee for its architectural services on The Braxton's project. Furthermore, there is no dispute that Mr. Burrow later signed a Purchase Agreement with The Braxton, LLC whereby he would receive a penthouse as "consideration of design fees owed" on the building project.

Contract interpretation is a matter of law; consequently, we conduct a de novo review with no presumption of correctness awarded to the trial court's interpretation. TENN. R. APP. P. 13(d); *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014); *Allmand v. Pavletic*, 292 S.W.3d 618, 624-25 (Tenn. 2009). In interpreting a contract, this court must first "ascertain and . . . give effect to the intent of the contracting parties." *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012); *see also Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). This court must "ascertain the intention of the parties as expressed by the language of the document itself," and "[t]he words of a contract must be given their usual and ordinary meaning." *Grand Valley Lakes Prop. Owners Ass'n, Inc. v. Burrow*, 376 S.W.3d 66, 78 (Tenn. Ct. App. 2011). If the language of the contract is not ambiguous, "the parties' intent is determined from the four corners of the contract." *Ray Bell Constr. Co., Inc. v. Tenn. Dep't of Transp.*, 356 S.W.3d 384, 387 (Tenn. 2011)).

- 8 -

I.  Novation.

The Braxton argues that the trial court erred in granting summary judgment because a reasonable jury could legitimately find in its favor on the defense of novation.

We reiterate the summary of the law of novation from our prior opinion in this case:

"A novation is a contract substituting a new obligation for an old one[,]" thereby extinguishing the existing contract. *Blaylock v. Stephens,* 258 S.W.2d 779, 781 (Tenn. Ct. App. 1953); *see also Pac. E. Corp. v. Gulf Life Holding Co.,* 902 S.W.2d 946, 958-59 (Tenn. Ct. App. 1995). The four essential elements of a novation are: "(1) a prior valid obligation, (2) an agreement supported by evidence of intention, (3) the extinguishment of the old contract, and (4) a valid new contract." *Brown v. Columbia Precast, LLC,* No. M2010-00971-COA-R3-CV, 2011 WL 2976891, at *7 (Tenn. Ct. App. July 21, 2011) (citing *Burchell Ins. Servs., Inc. v. W. Sizzlin Steakhouse of Dyersburg,* No. E2003-01001-COA-R3-CV, 2004 WL 1459398, at *3 (Tenn. Ct. App. June 29, 2004)). A novation is never presumed; rather, it must be established by a "'clear and definite intention on the part of all concerned. . . .'" *Johnson City Elec. Supply Co., Inc. v. Elec. Inc.,* CA No. 81, 1986 WL 3885, at *3 (Tenn. Ct. App. Apr. 1, 1986) (quoting *Jetton v. Nichols,* 8 Tenn. App. 567, 574 (Tenn. Ct. App. 1928)). A novation need not be shown by express words, because the evidence supporting the parties' intent to agree on a novation "may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct." *Cumberland Cnty. Bank v. Eastman,* No. E2005-00220-COA-R3-CV, 2005 WL 2043518, at *4 (Tenn. Ct. App. Aug. 25, 2005) (citing *In re Edward M. Johnson & Assoc.,* 61 B.R. 801, 806 (Bankr. E.D. Tenn. 1986)). The party asserting the novation has the burden of proving a novation is intended. *Rhea v. Marko Constr. Co.,* 652 S.W.2d 332, 334 (Tenn. 1983).

*TWB Architects, Inc.*, 2014 WL 5502401, at *4.

In the previous appeal, we held that "a reasonable person could reach the conclusion that all parties did not intend for the Purchase Agreement to extinguish the Architect Agreement or the lien rights arising under that agreement." *Id.* at *6. On remand, the parties engaged in additional discovery, and The Braxton continues to take the position that a novation occurred when Mr. Burrow and The Braxton, LLC entered into the Purchase Agreement. The parties agree that the Architect Agreement is a "prior valid obligation" and that the Purchase Agreement is a "valid new contract." *Id.* at *4. TWB argues that the second and third elements, which require evidence of an intention to

- 9 -

extinguish the Architect Agreement, are not satisfied. The issue we must decide on appeal is whether, on remand, the trial court erred in deciding, at the summary judgment stage, to dismiss The Braxton's novation defense. The Braxton asserts that the defense should have gone to the jury.

To determine the intent of the parties, we look first to the language of the contract. *See Burrow*, 376 S.W.3d at 78. The pertinent language of the Purchase Agreement provides as follows:

> The purchase price . . . shall be: $0 in consideration of design fees owed in contract for architectural design between Progress Capital Partners, LLC and TWB Architects, Inc. dated 2/17/05.

As we stated in our previous opinion, "[i]t is undisputed that the Purchase Agreement does not directly express an intent to extinguish the entire Architect Agreement." *TWB Architects*, 2014 WL 5502401, at *4. We do not consider the contract language ambiguous, as The Braxton argues. The Purchase Agreement simply provides that the purchase price represents consideration for design fees owed under the Architect Agreement. The Purchase Agreement is only an agreement to purchase in the future; it is not an actual transfer of the condominium.

We may also look to subsequent conduct in determining the intention of the parties. *Id.* The trial court made findings of fact and conclusions of law on the issue of novation, including the following:

> At this stage, we have additional evidence produced by both parties as to intent. Mr. Burrow has produced several affidavits expressing his own belief that there was never an intention to extinguish his company's rights under the original agreement. He also produced deposition testimony by him and Rankin to establish that there was no intention to extinguish the original agreement. The defendant argues that Rankin's testimony is not credible due to contradictory assertions in an affidavit, and prior deposition testimony. However, the only two people involved in the negotiation of both the architect agreement and the purchase agreement were Burrow and Rankin. They are both on record, under oath, stating that there was no intention to extinguish the architect agreement by execution of the purchase agreement. Even if Rankin is found to not be a credible witness, the only other party to the negotiations, Burrow, asserts by affidavit and by deposition testimony that there was never any intent to extinguish the original agreement and that the debt owed TWB could only have been satisfied by payment of two percent (2%) of construction costs, or by alternatively conveying title to the penthouse condominium.

- 10 -

We agree with the trial court's reasoning here. A novation requires, that "*all* parties concerned with the transaction must evidence a clear and definite intent for the prior contract to be extinguished." *Id.* at *5. As The Braxton points out, "[w]here there is conflicting evidence, the parties' intent on a possible novation is a question of fact." *Lowe v. Smith*, No. M2015-02472-COA-R3-CV, 2016 WL 5210874, at *7 (Tenn. Ct. App. Sept. 19, 2016). In this case, The Braxton cannot prove novation because there is no evidence that Mr. Burrow intended a novation when he signed the Purchase Agreement. There is, therefore, no conflicting evidence and no need for a jury to resolve any factual issues.

## II. Merger.

The Braxton next argues that, under the doctrine of merger, because the Architect Agreement and the Purchase Agreement are inconsistent, the latter prevails and only Mr. Burrow's right to recover under the Purchase Agreement remains. We disagree with this reasoning.

The doctrine of merger has been summarized as follows:

> The merger doctrine is well-established in Tennessee; the doctrine puts structure to ascertaining the parties' intent where there are successive agreements. *See Dunn v. United Sierra Corp.*, 612 S.W.2d 470, 474 (Tenn. Ct. App. 1980); 17A AM.JUR.2D *Contracts* § 539 (2011). Synthesizing the holdings in Tennessee caselaw, the merger doctrine has been summarized as follows: "Under the doctrine of merger, parties to a contract may enter into a subsequent agreement concerning the same subject matter as the prior one; the earlier contract . . . merges into the latter contract, and is rescinded or extinguished." Stephen W. Feldman, 22 Tenn. Prac. Series, *Contract Law and Practice* § 10.11 (2011) (citing cases). *For merger to apply, the successive contracts must have the same parties*, and they generally "must contain inconsistent terms such that they cannot stand together as supplemental agreements." *Id.; see also* RESTATEMENT (SECOND) OF CONTRACTS § 279 (Supp. 2011). Under these circumstances, the "subsequent contract then stands as the only contract between parties." *M & M Props. v. Maples,* No. 03A01-9705-CH-00171, 1998 WL 29974, at *10 (Tenn. Ct. App. Jan. 12, 1998).

*Shree Krishna, LLC v. Broadmoor Inv. Corp.*, No. W2011-00514-COA-R3-CV, 2012 WL 312254, at *14 (Tenn. Ct. App. Feb. 1, 2012) (emphasis added). As discussed in our prior opinion, the parties to the Architect Agreement and the Purchase Agreement were not the same. *TWB Architects*, 2014 WL 5502401, at *5. The Architect Agreement was between Progress Capital and TWB; the Purchase Agreement was between Mr. Burrow and The Braxton, LLC. *Id.* Progress Capital and The Braxton were, arguably, in privity.

*Id.* There is no dispute, however, that Mr. Burrow signed the Purchase Agreement in his individual capacity, not on behalf of TWB. *Id.* Because the parties were not the same in the two contracts, the doctrine of merger does not apply.

Moreover, as stated in our previous opinion, "we do not view the Purchase Agreement to be a substitute contract." *Id.* at \*6. Rather, the two contracts are to be construed together.

III. Waiver.

The Braxton asserts that "a reasonable jury could legitimately find that TWB voluntarily relinquished its right to recover design fees in return for Burrow's right to the Penthouse."

Under Tennessee law, "'[a] waiver is a voluntary relinquishment by a party of a known right.'" *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003) (quoting *Chattem, Inc. v. Provident Life & Acc. Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984)). A waiver "'may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct.'" *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010) (quoting *Chattem*, 676 S.W.2d at 955). "'[W]aiver is proven by a clear, unequivocal and decisive act of the party, showing a purpose to forgo the right or benefit which is waived.'" *Id.* (quoting *E & A Ne. Ltd. P'ship v. Music City Record Distribs., Inc.*, No. M2005-01207-COA-R3-CV, 2007 WL 858779, at \*7 (Tenn. Ct. App. Mar. 21, 2007)). The party claiming waiver must prove it by a preponderance of the evidence. *Id.*

The Braxton's waiver theory is that "TWB and Burrow expressly agreed to the Purchase Agreement and then acquiesced to the substituted performance and, for a period of almost three years, took no steps to pursue its alleged claim for fees under the Architect Agreement." This argument fails because Mr. Burrow was not acting on behalf of TWB, as discussed above and in our prior opinion. *TWB Architects*, 2014 WL 5502401, at \*5. As the trial court stated, "this Court finds that the two agreements were executed by different parties, and that Burrow signing individually on the purchase agreement did not constitute an agreement by TWB, to waive its rights under the architect agreement." Moreover, as we found in our previous opinion, TWB timely filed its lien claim. *Id.* at \*8. There is, therefore, no merit to The Braxton's argument that TWB delayed in asserting its lien rights, thereby waiving its rights.

We believe that the fact that the same parties were not involved in the two transactions is dispositive on the waiver issue. However, we also find no merit in The Braxton's argument that there are facts that would support a denial of summary judgment to TWB on the waiver defense. The Braxton argues that, even with the lack of privity,

the following acts and declarations could lead a reasonable jury to find in favor of The Braxton on the defense of waiver: Mr. Burrow moving into the penthouse, collecting rents, demanding to close, and claiming a possessory interest in the penthouse; Mr. Burrow's ceasing invoices for design services, assertion of a claim for specific performance of the Purchase Agreement, and assertion of a right to possess the penthouse; TWB allowing third parties to rely upon the non-assertion of rights under the Architect Agreement; and Mr. Burrow admitting in an email that he had "insufficient security for being paid." The trial court stated: "The defendant has admitted that the facts supporting the waiver defense are identical to those supporting the novation defense." The court went on to note that it had previously found that these facts did "not support a finding of intent to extinguish the architect agreement."

As stated above, a defendant must prove waiver by "clear, unequivocal and decisive act[s]." *Shoney's*, 330 S.W.3d at 202. In light of the other evidence in the record, the acts and declarations cited by The Braxton are most consistent with Mr. Burrow's hope that he would be able to purchase the penthouse. They do not indicate a definite intent to abandon the original architect design fees in the event that the penthouse sale never occurred. We agree with the trial court that "those same facts do not rise to the level of clear, unequivocal and decisive acts of Burrow reflecting a purpose to waive the corporation's rights under the architect agreement."

IV. Estoppel.

The Braxton argues that Progress Capital relied on the substitution of TWB's lien rights for Mr. Burrow's contract right to a penthouse when it executed a warranty deed transferring the property to The Braxton, LLC, and that The Braxton, LLC relied on TWB's release of its lien by obtaining construction financing and verifying to the construction lender that there were no outstanding architect fees owed when the loans were made. The Braxton asserts that a jury must decide whether TWB should be estopped from pursuing its lien claim.

The doctrine of equitable estoppel requires proof of the following elements with respect to the party estopped:

"(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts."

- 13 -

*Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 823 (Tenn. Ct. App. 2011) (quoting *Harvey v. Farmers Ins. Exch.*, 286 S.W.3d 298, 304 (Tenn. Ct. App. 2008)). As to the party claiming the estoppel, the required elements are as follows:

> "(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially[.]"

*Id.* (quoting *Harvey*, 286 S.W.3d at 304); *see also In re Estate of Meek*, No. M2013-01070-COA-R3-CV, 2014 WL 2553469, at *8 (Tenn. Ct. App. June 4, 2014).

The Braxton's estoppel argument fails to present a jury question because The Braxton has not established a misrepresentation or concealment of facts by TWB. The defendants' assumption that the architectural fees were no longer owed does not reflect any wrongdoing on the part of TWB. We agree with the trial court: "The failure to demonstrate any fraud on the [part] of the plaintiff prevents the defendant from being able to assert estoppel as a matter of law, and the plaintiff's motion as to this defense should be granted." Moreover, with respect to the element of reliance, the trial court properly remarked that, "[T]he Braxton could not have reasonably relied on the enforcement of the purchase agreement, when the Braxton's encumbering of the subject condominium rendered it unable to convey the title pursuant to that agreement."

## V. Unclean Hands.

The Braxton also asserts that the trial court erred in granting summary judgment to TWB on The Braxton's defense of unclean hands. According to The Braxton, a reasonable jury could find in its favor on this defense.

The doctrine of unclean hands states that a person who comes before a court of equity must do so with clean hands. *Emmit v. Emmit*, 174 S.W.3d 248, 252 (Tenn. Ct. App. 2005). This fundamental principle of equity is designed to "enable[ ] a court to prevent a party from profiting from her own misconduct." *Id.* at 253 (citing *McCallie v. McCallie*, 719 S.W.2d 150, 154 (Tenn. Ct. App. 1986)). The doctrine of unclean hands provides a basis for denying relief to a party who has "willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007) (footnote omitted).

The Braxton argues that a jury could find that one or more of the following actions of TWB or Mr. Burrow were wrongful or committed in bad faith:

> TWB did not properly account for payments made towards its design fees . . . . Additionally, TWB seeks to recover design fees under the Architect

Agreement despite having received benefits under the Purchase Agreement. Finally, . . . Burrow's efforts to avoid the tax consequences of the related transactions should be considered by the jury in determining whether TWB was acting in good faith and is entitled to relief.

The trial court addressed The Braxton's affirmative defense of unclean hands as follows:

The defendant's affirmative defense of unclean hands rests on four theories, that TWB is pursuing a lien claim that it forfeited by executing the purchase agreement; that TWB failed to credit ninety thousand (90,000.00) from Progress against the lien amount; that Burrow and Rankin had a "side deal" to alter the amount owed under the architect agreement; and that TWB seeks recovery under the architect agreement despite failing to perform a substantial and material number of its obligations under the agreement.

This Court has previously found that the purchase agreement did not extinguish TWB's rights under the architect agreement, thus the first basis of this defense cannot be proven. The testimony of Burrow and Rankin, as well as the exhibits establish that the ninety thousand dollars ($90,000.00) in question were loans made to Burrow personally. The checks were made to Burrow individually, rather than TWB, and the defendant may imply but cannot prove that these payments were anything other than loans, as Burrow and Rankin assert. The defendant admits that there is no proof of a side deal, and therefore there is no evidence in the record to support this allegation. The deposition excerpt of the Braxton's corporate representative Robert Holland, demonstrates that the defendant at this stage, has no evidence to establish the allegation that TWB failed to perform its obligation under the architectural agreement.

We agree with the reasoning of the trial court and find no merit in the arguments of The Braxton.

VI. <u>Willful Exaggeration of Lien.</u>

The Braxton's final defense is that TWB "willfully and grossly exaggerated" the amount for which it claimed a lien, thereby violating Tenn. Code Ann. § 66-11-139.[7] The

---

[7] Tennessee Code Annotated section 66-11-139 states:

If, in any action to enforce the lien provided by this chapter, the court finds that any lienor has willfully and grossly exaggerated the amount for which that person claims a lien, as stated in that person's notice of lien or pleading filed, in the discretion of the court, no recovery may be allowed thereon, and the lienor may be liable for any actual

basis for The Braxton's argument is three payments totaling $90,000 made by Progress Capital to Mr. Burrow in 2005; The Braxton asserts that these were payments on TWB's design fees and should have been subtracted from the lien amount claimed. The trial court concluded that "the proof in this record is that these payment[s] were loans from Progress to Burrow, individually, not payments on the TWB fees, and the only two parties to the transaction, Burrow and Rankin, agree that these were loans."

TWB's position is that the payments totaling $90,000 were intended as a loan. In the memo line of the checks, Mr. Rankin wrote that they were for "marina architecture." Mr. Burrow testified in an October 2015 deposition as follows:

A. . . . And the understanding was that TWB, if it's going to hold off on not being paid pending the selling of a condo to Burrow for zero dollars, TWB said to Rankin, "You know, there's a lot of money that's not being paid, and TWB is going to do a lot of work and there's going to be some cash flow problems," and so—and then Rankin said, "Well, I will loan you personally 50- to $100,000, and that will help out." And so this was a loan to Tim Burrow personally.
Q. Did Mr. Rankin say that he would loan it to you?
A. I can't remember if he said it would be him or Progress Capital. I just can't remember. I think he just said "I," but he might have meant Progress Capital when he said "I." I just don't know.
Q. What were the terms of the loan?
A. The terms were zero interest rate. It would be paid back after the condominium is deeded to Tim Burrow and then Tim Burrow would have a free and clear condominium, you know, right when it's done. Right when it's completed Burrow would be sold a condominium for zero dollars free and clear, and then Burrow could turn around and get a first mortgage loan pretty easily for the 90,000 or however much he'd loaned and pay him back.

To support its position that the money was payment for design fees, The Braxton points to Mr. Rankin's statements in a March 23, 2010 deposition. Mr. Rankin gave the following testimony when asked about his intention in giving Mr. Burrow a $20,000 check from Progress Capital for marina architecture:

A. I'm suggesting to you that upon review of these checks, I wrote marina architecture on at least one of them. So I would not—I don't know of any note or deed of trust or anything we executed to secure the $90,000. I've never made a loan to anybody greater than however many dollars, 500,

expenses incurred by the injured party, including attorneys' fees, as a result of the lienor's exaggeration.

- 16 -

unless there was a note or a deed of trust or something, in my life. Unless it's for services they had provided. So my answer to your question is I think I was giving Tim [Burrow] money for payment of invoices he had been providing, and at some point about what—the amount of work I thought he had done. So I didn't need security or a note because he provided them to us.

Q. So your testimony under oath is that you did not have an agreement—

A. Correct.

Q. –of any sort?

A. To loan him money.

Q. –to loan Tim Burrow money?

A. I know of no agreement.

Q. You believe that you made a payment—

A. Right.

Q. –or payments—

A. Right.

Q. –for design services?

A. Right. Partial payments.

Thus, based largely on his general practice of not making large loans without a note or security, Mr. Rankin assumed the $90,000 was paid for design services.

When presented with new information, however, Mr. Rankin revised his testimony at a deposition taken on November 12, 2015.[8] At that deposition, Mr. Rankin was shown a check for $50,000 from Progress Capital to Mr. Burrow along with an email containing the following letter sent to him by Mr. Burrow on April 21, 2006:

Dear John:
To keep our records straight, I thought I would reduce to writing the loans you have made to me:
$50,000 on September 12, 2005
$20,000 on January 25, 2006
$20,000 on February 7, 2006
Thank you very much.
Very truly yours,
Timothy W. Burrow

Mr. Rankin responded as follows:

A. All right. I knew there was an email somewhere about this. Here we go.

_____

[8] Mr. Burrow himself acted as the plaintiff's attorney at this deposition.

- 17 -

BY MR. BURROW:

Q. And this is an email from you to me, correct?

A. It's an email from you—from you to me that says, "Here's a promissory note." That's probably with the $50,000. There you go. Ah, so it's true I wouldn't have made someone a loan over $500 without a note or some sort of security. I think this—what I see here is that you offered me a note and I said, "Hey, I don't think it's necessary. You've done more than that in work. If it's okay with you, let's just write a check so we can call it whatever we need to in the end," whether—whether it needs to be—so let's—let's say—and that totally makes sense to me.

So, like, we don't—we have this contract that says "if," "and," "but," you know, get this for this 2 percent or the—or hourly fees. We don't know what it would be. Let's—if it's—and I say just $50,000. That's a lot of money. But at the time I was just saying is it necessary? You've done more than that work. In the end, let's figure it out, right? Let's figure out what we do with it. Because you may get hourly, you may get 2 percent fees, you may get a condo.

. . . .

So this is a letter from you to me saying, "To keep our records straight, I thought I would reduce this to writing." And that explains the 90,000 that we—that was in that deposition.

Q. It says—yeah. It says here, from me to you, "I thought I would reduce to writing the loans you have made to me." And it lists three payments there; is that correct?

A. Yeah. And this is way before anybody else is involved in this project.

. . . .

Q. Then when you—when you go to—so was that an accurate description of what it was?

A. Yeah. That sounds about right.

. . . .

Q. Yeah. Are those amounts correct?

A. Yes.

Q. And are they loans, the 50,000, 20,000 and 20,000?

A. It appears, at this time, it was your intent to consolidate the numbers, the dates, and say—and confirm that they were loans. I don't know what my response was to this or that I even had one or I just accepted it. This was very early on in the project.

Q. Okay. But wouldn't it be reasonable if they were not loans that you would have responded by saying no, Tim, it's not a loan; it's something else?

A. If I responded and said they're not loans, then it would be reasonable—

Q. Okay.

- 18 -

A. –to assume that.

Q. But if you did not respond to this—

A. I would assume they were loans, otherwise I would object.

In an attempt to suggest inconsistencies in Mr. Rankin's testimony, The Braxton cites the following statements made by Mr. Rankin during the November 2015 deposition when questioned by The Braxton's attorneys about his testimony at the March 2010 deposition:

> I still believe if I wrote "marina architecture" on that $20,000 check, that would have—you know, at the time when I wrote the check, I was writing it for marina architecture.

Mr. Rankin went on to state:

> So, you know, in general, I didn't mind loaning Tim $70,000 if—and I don't know why I said 90, but $70,000 because he had [these] other services he was providing that would—that if he didn't pay me back, I'd just say, you know, "I'm not going to pay you for your services." So the answer's yes, I felt like I had no problem giving him the money because I owed him on another—on a project, right? So whether we call it fees for services or we call it a loan, I think I was clear saying I didn't need a security or not because he provided the architecture services to us.

Taking Mr. Rankin's testimony as a whole, viewed in the light most favorable to The Braxton, we agree with the trial court that both Mr. Rankin and Mr. Burrow testified that the $90,000 payments were given as loans. Therefore, there is no merit to The Braxton's affirmative defense of willful exaggeration of the lien.

## CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, The Braxton, LLC and Fidelity and Deposit Company of Maryland.

_____
ANDY D. BENNETT, JUDGE